Present:  All the Justices

JASON KING, AN INFANT, ETC.

v.  Record No. 951688    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                           June 7, 1996
ANN B. SOWERS, M.D., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Roy B. Willett, Judge

In this appeal of a judgment entered in a medical malpractice action, we consider whether the trial court erred (1) in instructing the jury regarding "acceptable and customary" methods of treatment, and (2) in permitting certain testimony by an ophthalmic pathologist, including his evaluation of a computerized axial tomography (CT scan).

Jason D. King, an infant (King), filed an amended motion for judgment by his next friend, Cheryl King, his mother, against Ann B. Sowers, M.D., Ronald D. Harris, M.D., and Gill Memorial Eye, Ear, Nose and Throat Clinic, P.C. (the defendants).  King alleged that the defendants were negligent in their treatment of a dermolipoma, a benign tumor in his right eye.

King first sought treatment from Dr. Sowers for the dermolipoma in 1988.  The tumor was located on the posterior region of King's eye and usually could not be seen unless the lid was pulled away from the eye.  A portion of the tumor, however, was visible when King moved his eye in certain directions.  In these limited circumstances, someone observing his eye could see what appeared to be a pink dot the size of a sharp pencil point.

Dr. Sowers diagnosed the tumor as a dermoid cyst, which does

not require treatment as long as it does not interfere with vision and remains cosmetically unobjectionable. Dr. Sowers instructed King to seek further treatment only if the tumor grew so that it was visible without lifting the eyelid.

Dr. Sowers testified that when King returned for treatment of his eye in April 1991, the tumor had not changed in appearance or size. At that time, Dr. Sowers also observed that King's visual acuity was normal for a child of his age.

Dr. Sowers stated that she told King's mother that removal of the tumor was not indicated except for cosmetic reasons. King's mother, however, testified that Dr. Sowers told her the tumor had grown and needed to be removed. She further testified that Dr. Sowers did not tell her that the surgery was indicated solely for cosmetic reasons.

Dr. Sowers next testified that, in May 1991, she surgically removed the tumor, which measured 1.5 centimeters by 1.2 centimeters by .7 centimeters. She stated that she removed the tumor intact because, if the contents of a dermoid cyst spill into the eye, it will become severely irritated.

The pathology report on the tumor indicated that it was a dermolipoma rather than a dermoid cyst. Although these two types of growths appear similar, a dermolipoma is a relatively solid, homogenous mass, while a dermoid cyst has a more fluid center. In excising a dermolipoma, only the visible portion of the tumor should be removed. There is no danger of spilling the contents

of a dermolipoma into the eye.

The pathology report also indicated that Dr. Sowers inadvertently had removed a portion of King's lacrimal tissue during the surgery. The removed tissue showed signs of scarring and included lymphoid cells. These abnormalities in the lacrimal tissue were unrelated to the dermolipoma in King's eye. The scarring and presence of the lymphoid cells indicated that King's lacrimal gland had been diseased prior to the excision of the tumor.

Dr. Sowers testified that, in December 1991, King returned complaining of severe pain in his right eye. At this time, she observed that King's right cornea had become scratched. She believed that the condition resulted from a chemical irritation and advised King to continue the use of antibiotic eye drops that she had prescribed earlier.

Later that month, King again consulted Dr. Sowers and informed her that he was experiencing even more severe pain in his right eye. He told Dr. Sowers that it felt like a "knife sticking" in his eye. At that time, Dr. Sowers observed that the cornea of King's right eye was heavily scratched, and that his visual acuity in that eye was reduced. Dr. Sowers concluded that this problem might have been aggravated by King rubbing the eye. She advised King's parents to stop use of the eye drops and placed a patch over his right eye to aid the healing process.

In January 1992, King sought treatment from two other

ophthalmologists, Dr. David A. Kinsler and Dr. B. Allen Watson, who concluded that the cause of King's severe pain was a condition known as dry eye. This condition results from insufficient lubrication in the eye, which causes intense pain and may damage the surface of the eye.

In March 1992, King sought treatment from Dr. John D. Gottsch at Johns Hopkins University Hospital. Dr. Gottsch concluded that King had dry eye in both eyes. However, he found that the condition was more severe in the right eye. Dr. Gottsch attributed the more severe case of dry eye in the right eye to the fact that Dr. Sowers had removed lacrimal tissue, the tissue that produces tears for the eye, during excision of the dermolipoma.

Dr. Gottsch testified that Dr. Sowers breached the standard of care for an ophthalmologist in several aspects of her treatment of King. First, he testified that she should not have performed the surgery. He relied on the fact that the medical records did not demonstrate that the tumor was harmful to King's vision, or that the tumor impaired the physiology of his eye. In addition, Dr. Gottsch testified that the medical records did not indicate that the tumor was visible to common observation. Therefore, he concluded that King's condition did not provide a basis for the decision to remove the tumor.

Dr. Gottsch also testified that Dr. Sowers' surgical technique failed to comply with the standard of care. He

asserted that she should have recognized that the tumor did not have the characteristic appearance of a dermoid cyst, should have removed only a portion of the dermolipoma, and should not have removed lacrimal tissue from the eye.  In addition, Dr. Gottsch stated that Dr. Harris, who assisted in the surgery, also breached the standard of care for an ophthalmologist by failing to recognize that the tumor was not dermoid in character.

Finally, Dr. Gottsch testified that Dr. Sowers and Dr. Harris breached the standard of care in their postoperative treatment of King.  He stated that they should have observed from the pathology report that Dr. Sowers had removed lacrimal tissue.  According to Dr. Gottsch, Dr. Sowers and Dr. Harris then should have monitored King closely for dry eye and should have recognized the symptoms as soon as they manifested themselves in late 1991.

Dr. Sowers presented evidence that her treatment of King did not constitute a breach of the standard of care.  Dr. Earl R. Crouch, Jr., an ophthalmologist, testified that King's dry eye was not caused by the excision of lacrimal tissue, and that the excision of this tissue did not harm King's eye.  However, Dr. Crouch also testified that the excision may have exacerbated the dry eye.

Dr. Lorenz E. Zimmerman, an ophthalmic pathologist, reviewed a CT scan and some tissue samples of King's dermolipoma and lacrimal gland tissue.  He testified that King's pain was caused

by Sjogren's syndrome, an auto-immune disease characterized by symptoms such as dry eyes, dry mouth, arthritis, and thyroiditis. However, Dr. Zimmerman acknowledged that he had not reviewed the results of tests given King, from which King's pediatrician, Dr. William N. Gordge, had concluded that King did not have Sjogren's syndrome.

Dr. Crouch and Dr. Michael A. Lemp, another ophthalmologist, testified that King's medical history indicated that excision of the tumor was appropriate to correct the appearance of his eye, since his mother had requested the surgery. Dr. Crouch also testified that the surgery performed by Dr. Sowers and Dr. Harris met the prevailing standard of care for ophthalmologists in Virginia. He stated that a dermoid cyst appears almost identical to a dermolipoma and must not be opened during surgery. Dr. Crouch concluded that Dr. Sowers and Dr. Harris properly removed the tumor, and that their removal of a small portion of the lacrimal gland during surgery did not constitute a deviation from the standard of care.

Dr. Crouch also stated that the postoperative care given King by Dr. Sowers and Dr. Harris met the standard of care. He explained that, if dry eye had resulted from the surgery itself, it normally would have appeared within about two weeks after the May 1991 operation.

The jury returned a verdict in favor of the defendants. The trial court overruled King's motion to set aside the verdict and

entered final judgment for the defendants.

On appeal, King first asserts that the trial court improperly granted jury instruction 12, which stated that a mere difference in views between practitioners as to treatment, or as to medical judgment exercised, is not sufficient in itself to support an action for malpractice where it is shown that the judgment exercised is an acceptable and customary method of performing the treatment, under the circumstances presented to the treating physician.

King asserts that this instruction misstated the law and was inapplicable under the evidence in this case.

In response, the defendants assert that King failed to object to the instruction in the trial court on the ground that it misstated the law, but only objected on the ground that the instruction was inapplicable under the evidence presented. Further, the defendants contend that the decision whether to operate on King's eye, the determination of what portion of the tumor to remove, and the postoperative care of King all involved questions of medical judgment. Therefore, they argue that the jury instruction was properly given under the facts of this case.

Initially, we agree with King that this instruction is an incorrect statement of law. The relevant issue in a medical malpractice action is whether the treatment rendered violated the applicable standard of care and whether any such breach of the standard of care was a proximate cause of the plaintiff's injury. Rogers v. Marrow, 243 Va. 162, 167, 413 S.E.2d 344, 346 (1992); Brown v. Koulizakis, 229 Va. 524, 532, 331 S.E.2d 440, 445-46

- 7 -

(1985). An instruction to the jury regarding "an acceptable and customary method of treatment" is inapposite to this determination. See Nesbitt v. Community Health of South Dade, Inc., 467 So. 2d 711, 714 (Fla. Dist. Ct. App. 1985).

Nevertheless, the instruction became the law of the case because the objection at trial did not challenge the legal content of the instruction. Medical Center Hosps. v. Sharpless, 229 Va. 496, 498, 331 S.E.2d 405, 406 (1985); Norfolk & Portsmouth R.R. v. Barker, 221 Va. 924, 928, 275 S.E.2d 613, 615 (1981). Thus, without approving the instruction, we consider the objection King raised in the trial court, namely, whether the instruction was properly given under the evidence. See Banner v. Commonwealth, 204 Va. 640, 646, 133 S.E.2d 305, 309 (1963).

At trial, King objected to instruction 12 on the basis that the evidence did not present a difference in medical views regarding the treatment that should have been provided. King further argued at trial, as he does on appeal, that the evidence showed only an absence of acceptable treatment by the defendants. We disagree.

The evidence presented a difference in views among the experts as to the medical judgment and the treatment that the defendants rendered. Dr. Gottsch testified that the decision to remove the tumor was a breach of the standard of care, while both Dr. Lemp and Dr. Crouch testified that the decision met the standard of care for a treating ophthalmologist. Dr. Lemp and

Dr. Crouch also testified that Sowers' decision to remove the entire tumor did not constitute a breach of the standard of care, while Dr. Gottsch stated that only the visible portion of the tumor should have been removed. There was also conflicting evidence regarding the issue whether the postoperative care that Dr. Sowers and Dr. Harris gave King constituted a breach of the standard of care.

This testimony plainly established a "difference in views [among] practitioners as to treatment, or as to medical judgment exercised." Thus, this language in instruction 12 addressed an issue raised by the evidence, and we conclude that King's argument on this ground is without merit.

King also contends that the trial court erred in permitting Dr. Zimmerman to testify that the cause of King's dry eye was Sjogren's syndrome. Dr. Zimmerman's conclusion was partially based on his interpretation of a CT scan. King asserts that, since Dr. Zimmerman is neither a radiologist nor a rheumatologist who treats this type of auto-immune disease,[*] this testimony was speculative, beyond the scope of his expertise, and highly prejudicial. We disagree.

The issue whether a witness is qualified to express an

---

[*]A rheumatologist generally treats Sjogren's syndrome, based on the syndrome's characteristic symptoms of bilateral dry eye, arthritis, and thyroiditis.

expert opinion is a question submitted to the sound discretion of the trial court. Maxwell v. McCaffrey, 219 Va. 909, 912, 252 S.E.2d 342, 344 (1979); Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). The record must show that the proffered expert possesses sufficient knowledge, skill, or experience to render him competent to testify as an expert on the subject matter of the inquiry. Griffett v. Ryan, 247 Va. 465, 469, 443 S.E.2d 149, 152 (1994); Noll, 219 Va. at 800, 250 S.E.2d at 744.

Here, both parties agreed that Dr. Zimmerman is the leading ophthalmic pathologist in the world. Dr. Zimmerman testified that he regularly reviews CT scans, X-ray films, and other tests in evaluating tissue samples for the presence of disease. He explained that, although he has not had formal training in radiology and does not consider himself an expert in that field, he is able to read and interpret CT scans. Dr. Zimmerman further stated that, if he is unable to read a CT scan, he consults with a radiologist. However, he testified that he was able to read and interpret the CT scans of King's eye without requesting a radiologist's opinion. Dr. Zimmerman also indicated that, as a pathologist, he is familiar with the cellular manifestations that are characteristic of Sjogren's syndrome.

We conclude that the trial court did not err in permitting Dr. Zimmerman's testimony on these issues, since the evidence showed that he regularly evaluated CT scans in his pathology practice, and that he has skill and experience in recognizing

Sjogren's syndrome.  See Lo v. Burke, 249 Va. 311, 318-19, 455 S.E.2d 9, 13-14 (1995).  The fact that Dr. Zimmerman did not qualify as an expert in radiology or rheumatology is relevant only to the weight to be given his testimony by the trier of fact.

For these reasons, we will affirm the trial court's judgment.

Affirmed.