PRESENT:  All the Justices

HUNTER S. TASHMAN, M.D.

v.  Record No. 010028   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                January 11, 2002
MARGARET GIBBS

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Dennis J. Smith, Judge

In this appeal of a judgment in favor of a plaintiff in a medical malpractice action, we consider whether the trial court erred in permitting the plaintiff's "informed consent" claim to be considered by the jury.

We state the evidence in the light most favorable to the plaintiff, Margaret L. Gibbs, the prevailing party in the trial court.  City of Bedford v. Zimmerman, 262 Va. 81, 83, 547 S.E.2d 211, 212 (2001).  The evidence showed that Gibbs had received obstetrical and gynecological care from the defendant, Hunter S. Tashman, M.D., over a period of several years.  Dr. Tashman had delivered both of Gibbs' children and had successfully performed bladder suspension surgery on her.  After the delivery of her second child, Gibbs developed a severe uterine and vaginal prolapse, a condition in which the uterus collapses and protrudes through the vagina.

In August 1996, Dr. Tashman examined Gibbs and advised her that she needed a total hysterectomy and a sacrospinous ligament suspension procedure (sacrospinous procedure) to correct the

prolapse.  In a sacrospinous procedure, the prolapsed vagina is pulled back into position and secured with sutures fixed to the sacrospinous ligament.

In October 1996, Dr. Tashman performed a total hysterectomy and a sacrospinous procedure on Gibbs.  When Gibbs awoke from surgery, she experienced severe pain that radiated from her right hip, through her right leg, and into her foot.  Gibbs could not straighten her right leg or place any weight on it, and she experienced numbness in her vaginal area.

The next day, Dr. Tashman examined Gibbs and informed her that her pain might have "something to do with the sciatic nerve."  After consulting with a neurologist, Dr. Tashman concluded that the sutures made during the sacrospinous procedure needed to be removed.  Three days after the initial operation, Dr. Tashman performed a second surgery to remove the sutures.

After the second surgery, Gibbs was able to straighten her right leg and to stand upright.  Although her level of pain was reduced, Gibbs still experienced "a great deal of pain."  She ultimately was diagnosed with permanent injury to her sciatic and pudendal nerves.  As a result of these nerve injuries, Gibbs has experienced recurring medical problems, including permanent pain and a burning sensation in her right leg and hip, numbness

and loss of sensation in her right foot, and a loss of sexual function due to permanent genital numbness.

Gibbs filed a motion for judgment against Dr. Tashman, alleging that he was negligent in the manner in which he performed the sacrospinous procedure and in failing to obtain her "informed consent" to that procedure. Gibbs alleged that Dr. Tashman failed to obtain her "informed consent" because he did not tell her that he lacked experience in performing the sacrospinous procedure, and did not advise her of the nature and risks of the operation, including the risk of nerve damage.

During trial of the case, Gibbs presented the expert testimony of Hilary J. Cholhan, M.D., a gynecologist and obstetrician who is an associate professor at the University of Rochester. When asked to define the term "informed consent," Dr. Cholhan stated:

> [I]nformed consent is not just a piece of paper, it's a process, and it's a process of educating the patient so that the patient understands what conditions she has been diagnosed with and what treatment options are available to her, be they non-surgical or surgical. So it's not a piece of paper, it's essentially helping the patient understand his or her own condition so that she can make an informed consent based on the ability to determine what the advantages and disadvantages are of each treatment, and then the patient decides what he or she feels is appropriate as treatment.

Immediately thereafter, counsel for Gibbs asked Dr. Cholhan whether he had "an opinion to a reasonable degree of medical

3

certainty as to what [the] standard of care [in] Virginia required in 1996 regarding informed consent." Dr. Cholhan replied, "That, I answered."

Dr. Cholhan stated that there were different surgical alternatives available to correct Gibbs' condition. He referred to the sacrospinous procedure performed on Gibbs as the "transvaginal approach." In an alternative procedure, a sacral colpopexy, which is often referred to as the "abdominal approach," the surgeon makes an incision through the abdomen and uses the lower part of the spine in the back of the abdominal cavity as an anchoring point to support the vagina.

Dr. Cholhan testified that Dr. Tashman deviated from the standard of care when he failed to inform Gibbs of the "abdominal approach" as an alternative to the sacrospinous procedure. Dr. Cholhan stated:

> [T]he standard of care requires that all alternatives be discussed, and the abdominal approach was not discussed. Now, if Dr. Tashman – if it's not within his surgical armamentarium to do that, then you need to explain that to the patient, that is not within my armamentarium, other people favor doing it this way, however, I do not do it this way for these reasons. That was not discussed.

Dr. Cholhan defined "armamentarium" as "nothing more than repertoire, within the operator's skill and experience and knowledge."

4

When asked whether he had an opinion within a reasonable degree of medical certainty whether Dr. Tashman breached the standard of care with respect to obtaining Gibbs' "informed consent," Dr. Cholhan replied:

> [W]ith all the information that I have reviewed and that's been provided me, including Dr. Tashman's notes, I saw no evidence that any patient counseling occurred with respect to alternatives of treatment, advantages of one treatment over another, disadvantages, risk factors, or the like.

However, during cross-examination, Dr. Cholhan agreed that Dr. Tashman's only "shortcoming" concerning obtaining Gibbs' "informed consent" was his failure to explain to her the alternatives to the sacrospinous procedure. When asked whether the "abdominal approach" involved less potential risk than the "transvaginal approach," Dr. Cholhan responded that "[e]very procedure has inherent risks."

Gibbs testified that Dr. Tashman failed to inform her before the surgery that he had never performed a sacrospinous procedure as a "lead surgeon," and that she would not have consented to having him perform the surgery if she had been aware of his limited experience. Gibbs further testified that Dr. Tashman did not inform her of the possible risk of nerve damage from the sacrospinous procedure. According to Gibbs, Dr. Tashman only told her that the procedure could result in some blood loss and in vaginal dryness. With regard to blood loss,

5

Gibbs also stated that Dr. Tashman assured her that "we won't need" the two pints of blood that he instructed her to "bank."

At the conclusion of Gibbs' evidence, Dr. Tashman moved to strike the "informed consent" claim from the negligence action, arguing that the claim was not supported by sufficient evidence. The trial court denied the motion.

Dr. Tashman testified concerning his experience with the sacrospinous procedure. He stated that he had performed two sacrospinous procedures under the guidance of more experienced surgeons. He explained that on one of these occasions, he served as the "lead surgeon" and performed about 90 percent of the surgery. Dr. Tashman further stated that although the operation on Gibbs was the first time he performed the sacrospinous procedure by himself, he had the proper training and skills to perform the procedure.

Dr. Tashman testified that he informed Gibbs of his experience with the sacrospinous procedure and presented her with three options concerning who would perform her surgery. He told her that he could refer her to a more experienced surgeon to perform the surgery, that he could perform the operation himself with the assistance of a more experienced surgeon, or that he could perform the procedure "solo for the first time." Dr. Tashman stated that Gibbs said that she preferred that he

6

perform the surgery by himself because she was uncomfortable having "another surgeon in the room that she hasn't met yet."

Dr. Tashman also testified that he thought that "it crossed [his] mind to mention" to Gibbs the "abdominal approach" as an alternative surgical procedure, but he was unable to recall with certainty whether he had discussed this option with Gibbs. However, he stated that the "abdominal approach" would not have been appropriate for Gibbs because of a greater long-term risk of complications presented by that procedure.

Dr. Tashman also stated that he had informed Gibbs of the potential risks and complications of the sacrospinous procedure, including the risk of nerve damage. He testified that when he advised Gibbs and her husband of these facts, Gibbs acknowledged that she understood that the procedure would involve an additional level of risk.

Gibbs' husband, Raymond Dennis Gibbs, was called as a witness by Dr. Tashman, and testified that when he and his wife met with Dr. Tashman to discuss the surgery, "Dr. Tashman did not say anything at all about risk of injury to nerves in this procedure." Mr. Gibbs also testified that when he asked Dr. Tashman about the risks involved in the surgery, Dr. Tashman replied that the sacrospinous procedure was more complicated than the hysterectomy because, among other things, the surgical area contains "a lot of nerves." Mr. Gibbs stated that it was

7

his understanding that Dr. Tashman "was just explaining the procedure" when he made mention of this fact.

Dr. Tashman presented the expert testimony of Fred Mecklenburg, M.D., an obstetrician and gynecologist who is a clinical professor at George Washington University. Dr. Mecklenburg testified that Dr. Tashman's overall evaluation, care, and treatment of Gibbs complied with the applicable standard of care. Dr. Mecklenburg also concluded, based on his review of Dr. Tashman's office notes, that Dr. Tashman had conducted an "informed consent session" with Gibbs in which the surgery and its risks and complications were discussed.

Dr. Mecklenburg testified that the applicable standard of care did not require Dr. Tashman to discuss the "abdominal approach" with Gibbs. Dr. Mecklenburg stated that "[t]he most appropriate approach to [Gibbs'] particular set of circumstances is vaginal. Not only is the abdominal approach more difficult and more complicated, but [it] is less likely to result in correction of all of [Gibbs'] problems."

Dr. Mecklenburg testified that Dr. Tashman was "adequately prepared" to perform the sacrospinous procedure. Dr. Mecklenburg also stated that for someone with Dr. Tashman's experience in performing pelvic surgery, training for this particular procedure is merely a matter of familiarizing the

8

surgeon with the proper location and manner of suture placement, and that "[i]t comes down to the equation of see one, do one."

At the conclusion of this evidence, the trial court denied Dr. Tashman's renewed motion to strike Gibbs' "informed consent" claim. The jury returned a general verdict in favor of Gibbs in the amount of $4,000,000. Pursuant to Code § 8.01-581.15, the trial court reduced the jury's award to $1,000,000, and the court entered judgment on the verdict. Dr. Tashman appeals from this judgment, challenging the trial court's decision to allow the jury to consider Gibbs' "informed consent" claim. However, Dr. Tashman does not assign error regarding the sufficiency of the evidence of Gibbs' other claim that he was negligent in his performance of the sacrospinous procedure.

Dr. Tashman argues that the evidence was insufficient as a matter of law to support Gibbs' "informed consent" claim, including the nature and extent of his duty of disclosure, and whether any alleged breach of this duty was a proximate cause of Gibbs' injuries. He emphasizes that Gibbs' expert, Dr. Cholhan, did not identify the risks related to the sacrospinous procedure that a reasonably prudent obstetrician and gynecologist was required by the standard of care to disclose. Dr. Tashman further contends that Dr. Cholhan did not testify that the duty to obtain a patient's "informed consent" requires a physician to disclose to the patient the extent of his experience in

9

performing a particular procedure.  Finally, Dr. Tashman argues that while Dr. Cholhan's testimony may have established a breach of the standard of care in Dr. Tashman's failure to inform Gibbs of the "abdominal approach," there was no evidence that this omission proximately caused Gibbs' injuries.

In response, Gibbs asserts that the evidence was sufficient to establish that Dr. Tashman failed to obtain her "informed consent" because he did not disclose the risks of the sacrospinous procedure or advise her of any appropriate alternative procedures.  Gibbs also argues that the evidence was sufficient to establish that in obtaining a patient's "informed consent," a physician is required to disclose to his patient the extent of his experience in performing a proposed procedure. She contends that Dr. Cholhan's testimony supports this conclusion because he stated that a physician must disclose to his patient whether a certain procedure or skill is within his armamentarium.  We disagree with Gibbs' arguments.

A physician has a duty in the exercise of ordinary care to inform a patient of the dangers of, possible negative consequences of, and alternatives to a proposed medical treatment or procedure.  See Rizzo v. Schiller, 248 Va. 155, 158, 445 S.E.2d 153, 155 (1994).  To recover against a physician for failure to provide such information, the patient generally is required to establish by expert testimony whether and to what

10

extent any information should have been disclosed.  Moates v. Hyslop, 253 Va. 45, 48, 480 S.E.2d 109, 111 (1997); Rizzo, 248 Va. at 159, 445 S.E.2d at 155; Bly v. Rhoads, 216 Va. 645, 650-51, 222 S.E.2d 783, 787 (1976).

A physician's duty of disclosure is defined with reference to the appropriate standard of care.  See Dickerson v. Fatehi, 253 Va. 324, 327, 484 S.E.2d 880, 881 (1997); Rogers v. Marrow, 243 Va. 162, 167, 413 S.E.2d 344, 346 (1992); Raines v. Lutz, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986).  We have defined the standard of care in a medical malpractice action as that degree of skill and diligence exercised by a reasonably prudent practitioner in the same field of practice or specialty in Virginia.  Bryan v. Burt, 254 Va. 28, 34, 486 S.E.2d 536, 539 (1997); Pierce v. Caday, 244 Va. 285, 291, 422 S.E.2d 371, 374 (1992); Raines, 231 Va. at 113, 341 S.E.2d at 196.

A physician's deviation from the applicable standard of care must generally be established by expert testimony.  Dickerson, 253 Va. at 327, 484 S.E.2d at 881; Rogers, 243 Va. at 167, 413 S.E.2d at 346; Raines, 231 Va. at 113, 341 S.E.2d at 196.  Once a plaintiff has met the burden of establishing the standard of care and a deviation from that standard, she may establish by lay testimony that her physician did not disclose certain information regarding risks, and that she had no knowledge of those risks.  Bly, 216 Va. at 649-50, 222 S.E.2d at

11

787. As in other negligence actions, the plaintiff also must prove that the physician's negligent omissions were a proximate cause of the injury sustained. Bryan, 254 Va. at 34, 486 S.E.2d at 539-40; King v. Sowers, 252 Va. 71, 76, 471 S.E.2d 481, 484 (1996); Brown v. Koulizakis, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985).

In the present case, Gibbs' "informed consent" claim was based on three subjects that Dr. Tashman allegedly failed to disclose to her prior to the surgery. Those subjects were: 1) the risks of the sacrospinous procedure, including the risk of nerve damage; 2) Dr. Tashman's limited experience in performing the procedure; and 3) the available alternatives to the sacrospinous procedure.

On the issue of risks, we conclude that Gibbs failed to establish by expert testimony that the standard of care in 1996 for an obstetrician and gynecologist in Virginia required disclosure of any particular risks of the sacrospinous procedure, including the risk of nerve damage. Dr. Cholhan failed to identify any risks of the procedure that a reasonably prudent obstetrician and gynecologist was required to disclose to a patient contemplating such surgery. Instead, he merely stated that nerve damage is a risk of the procedure, and that he saw no evidence in the medical records that Dr. Tashman provided any patient counseling regarding risk factors.

12

Gibbs' contends, nevertheless, that Dr. Tashman's own testimony established the appropriate standard of care when he stated that he had advised Gibbs of certain risk factors, including the risk of nerve damage, that might result from the sacrospinous procedure. We disagree. This evidence from Dr. Tashman did not address the standard of care for disclosure of risks, but merely addressed the factual issue whether he made any disclosures to Gibbs.

Gibbs next contends, in the alternative, that she was not required to present expert testimony regarding the standard of care and Dr. Tashman's deviation from that standard because he did not advise her of any risks of the sacrospinous procedure. We do not reach the merits of this argument, however, because Gibbs' factual premise is incorrect. Gibbs testified that Dr. Tashman advised her that the surgery could result in blood loss, although it was unlikely, and in vaginal dryness. Thus, because Dr. Tashman advised Gibbs of certain risks of the sacrospinous procedure and Gibbs failed to present expert testimony establishing what the standard of care required regarding disclosure of risks, Gibbs' proof on this issue was insufficient as a matter of law.

On the issue of Dr. Tashman's experience, we conclude that Gibbs failed to establish by expert testimony that the appropriate standard of care in 1996 for an obstetrician and

gynecologist in Virginia required Dr. Tashman to disclose to Gibbs the extent of his experience in performing sacrospinous procedures. Dr. Cholhan did not state that the standard of care required a reasonably prudent obstetrician and gynecologist to disclose the extent of his prior experience in performing a particular surgery. Instead, in his discussion of the "abdominal approach," Dr. Cholhan stated that if Dr. Tashman did not have the skill and experience to perform that procedure, he was required to disclose this fact to his patient.

This testimony did not establish a standard of care requiring a physician to disclose his prior experience in performing a particular procedure, but addressed only the disclosure required by a physician who lacks the skill and experience to perform a particular procedure. Here, however, there was no testimony that Dr. Tashman lacked the skill or experience to perform a sacrospinous procedure. Dr. Mecklenberg testified that Dr. Tashman was "adequately prepared" to perform the procedure, based on his experience in performing pelvic surgery and his prior knowledge of the procedure. In addition, Dr. Tashman stated that he had the proper skill and experience to perform the sacrospinous procedure. Thus, we conclude that the evidence was insufficient as a matter of law to support this component of Gibbs' "informed consent" claim.

14

We next consider the third subject of Gibbs' "informed consent" claim, that Dr. Tashman failed to disclose the available alternatives to the sacrospinous procedure. Dr. Cholhan testified that the standard of care required Dr. Tashman to discuss the "abdominal approach" surgical alternative with Gibbs, and that Dr. Tashman failed to do so. In addition, Dr. Tashman was unable to recall whether he discussed this surgical option with Gibbs. This testimony, viewed in the light most favorable to Gibbs, established a standard of care requiring such disclosure and Dr. Tashman's deviation from that standard of care.

There is no evidence in the record, however, that this deviation from the standard of care was a proximate cause of Gibbs' injuries. In a medical malpractice action, a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, but must also prove that the negligent act was a proximate cause of her injury. Bryan, 254 Va. at 34, 486 S.E.2d at 539-40; King, 252 Va. at 76, 471 S.E.2d at 484. A proximate cause of an event is an act or omission that, in a natural and continuing sequence, produces the event, and without which the event would not have occurred. Sugarland Run Homeowners Ass'n v. Halfmann, 260 Va. 366, 372, 535 S.E.2d 469, 472 (2000); Atkinson v. Scheer, 256

15

Va. 448, 454, 508 S.E.2d 68, 71 (1998); Beale v. Jones, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970).

Here, Gibbs did not state that she would have decided against having the sacrospinous procedure if Dr. Tashman had informed her of the "abdominal approach" alternative. Instead, she stated that she would not have allowed Dr. Tashman to perform the sacrospinous procedure if she had known of his limited experience in performing that procedure. Thus, we conclude that Gibbs' evidence on this component of her "informed consent" claim was insufficient as a matter of law, because this evidence did not establish that Dr. Tashman's failure to inform her of the "abdominal approach" affected her decision to have him perform the sacrospinous procedure.

Because Gibbs' evidence regarding all three components of her "informed consent" claim was insufficient as a matter of law to raise a jury issue, we conclude that the trial court erred in submitting that part of her malpractice action to the jury. Based on the trial court's error, Dr. Tashman argues that the entire negligence action must be remanded for a new trial. We agree.

We cannot determine from the record whether the jury based its verdict on the issue of "informed consent" or on the issue of Dr. Tashman's alleged negligent performance of the sacrospinous procedure. Therefore, we cannot say that the

16

evidence and instructions erroneously submitted to the jury on the issue of "informed consent" did not affect its determination, and we must presume that the jury relied on such evidence and instructions in reaching its verdict.  See Ponirakis v. Choi, 262 Va. 119, 126, 546 S.E.2d 707, 711-12 (2001); Rosen v. Greifenberger, 257 Va. 373, 381, 513 S.E.2d 861, 865 (1999).

For these reasons, we will reverse the trial court's judgment and remand the case for a new trial on both counts of Gibbs' motion for judgment.

Reversed and remanded.