244

## CIRCUIT COURT OF THE CITY OF ROANOKE

Donna S. Guilliams

    v.

Carol A. Wray,
Katherine D. Vaughn,
Lewis-Gale Clinic, Inc.,
Lewis-Gale Clinic, L.L.C.,
LGC Roanoke, L.L.C.,
Lewis-Gale Physicians, L.L.C.,
Lewis-Gale Clinic
Same Day Surgery, L.L.C.,
and LGC Same Day Surgery, L.L.C.

September 9, 2009

Case No. CL07000791-00

BY JUDGE CHARLES N. DORSEY

Plaintiff Donna S. Guilliams has filed suit against Defendants Dr. Carol A. Wray, Katherine D. Vaughn, and Lewis-Gale Clinic[1] for injuries she allegedly suffered as a result of a foreign object being left in her body following a surgery on her breasts. In response, Defendants have filed two demurrers, a motion for partial summary judgment, and a motion to bifurcate. Plaintiff has filed a motion for leave to amend her complaint.

For the reasons that follow, the Court, after having considered the pleadings, the relevant case law, and the arguments of counsel, rules as follows:

Defendants' demurrers to Counts II, III, IV, and V of Plaintiff's Complaint are overruled;

Defendants' demurrer to Plaintiff's claim for punitive damages is overruled;

Defendants' demurrer to Plaintiff's claim for attorney's fees is overruled;

Defendants' motion for partial summary judgment is taken under advisement;

Defendants' motion to bifurcate is denied; and

Plaintiff's motion for leave to amend her complaint is granted.

## I. *Factual Background*

"A demurrer admits the truth of all material facts that are properly pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred from alleged facts." *Didato v. Strehler*, 262 Va. 617, 620, 554 S.E.2d 42, 43 (2001) (internal quotation marks and citation omitted). Accordingly, the Court states the facts as set forth in Plaintiff's Complaint.

### A. *The April 22 Surgery*

On April 22, 2005, Dr. Wray performed a bilateral mastopexy with augmentation on Guilliams at Lewis-Gale Clinic. As part of that procedure, Guilliams received two 430 cc saline breast implants. In the days that followed, Guilliams began experiencing drainage in her left breast. When she complained to Dr. Wray about the drainage during a follow-up visit on May 11, Dr. Wray recommended closure of the draining wound.

---

[1] As evidenced by the caption of this case, Plaintiff has named as defendants several Lewis-Gale entities. For simplicity, all of these entities will hereinafter be referred to collectively as "Lewis-Gale Clinic."

Sometime after the draining wound was closed, Guilliams suffered a rupture in a different area of her left breast. When she returned to Dr. Wray for another follow-up visit on May 25, Dr. Wray discovered a 1.5 cm. opening in her left breast that was draining blood and pus. At that time, Dr. Wray recommended that the left breast implant be removed.

## B. *The May 26 Surgery*

Dr. Wray removed Guilliams's left breast implant on May 26. During that surgery, Dr. Wray found a Ray-Tec sponge that had been used in the April 22 surgery behind the implant, in the left breast pocket. Dr. Wray removed the sponge and discarded it.

Following the May 26 surgery, Dr. Wray informed Guilliams that a sponge from the April 22 surgery had been left in her body and that, as a result, there would be no charge for the May 26 surgery or for the surgery to replace the implant. Dr. Wray also informed Guilliams that her body had rejected the implant but did not disclose that the rejection or any of the other complications with her left breast were potentially related to the sponge.

A few days after the May 26 surgery, Vaughn, a nurse employed by Lewis-Gale Clinic, called Guilliams at her home to talk about the May 26 surgery. In that call, Vaughn stated to Guilliams that she was fortunate that her body had rejected the implant because it had allowed Dr. Wray to discover the sponge. Vaughn further stated that the sponge did not cause Guilliams's body to reject the implant and that she therefore had no legal claim against Dr. Wray or anyone else at Lewis-Gale Clinic. In response, Guilliams expressed concern about the amount of work that she had missed because of the April 22 and May 26 surgeries. At that time, Vaughn suggested that she could talk to Dr. Wray about possibly reimbursing Guilliams for the cost of the April 22 surgery.

Guilliams returned to Dr. Wray on May 31 for another follow-up visit. During that visit, Dr. Wray indicated that Guilliams should have surgery in a week to insert a new implant in her left breast. Later that day, Vaughn informed Guilliams that the surgery had been scheduled for June 9 and obtained her consent.

On June 7, Vaughn again called Guilliams at her home to talk about the upcoming surgery. In that call, Vaughn informed Guilliams that Dr. Wray and Lewis-Gale Clinic had agreed to reimburse her for the cost of the April 22 procedure.

On June 9, just moments before Guilliams was rolled into the operating room to receive the new implant, Vaughn presented her with a reimbursement check for the cost of the April 22 surgery along with a paper to be signed. Although Guilliams was medicated at the time, Vaughn insisted that she needed to sign the paper before entering surgery but did not disclose its purpose. After Guilliams complied, Vaughn left the room without leaving a copy of the paper. Guilliams later learned that the paper purported to be a release of all claims against Dr. Wray or any other Lewis-Gale Clinic employee for the April 22 surgery.

D. *The June 9 Surgery*

Dr. Wray inserted a new 430 cc saline implant in Guilliams's left breast on June 9. In the days following the surgery, Guilliams again began to experience drainage in her left breast Accordingly, on July 6, Dr. Wray, after culturing the drainage, closed the draining wound and gave her a prescription for antibiotics. The cultures taken that day later tested positive for infection.

Then, on July 10, when the draining wound reopened, Dr. Wray recommended that the implant be removed. Soon after the implant was removed on July 12, Dr. Wray inserted a tissue expander in Guilliams's left breast. Over the next few months, Dr. Wray gradually added fluid to the expander. When the fluid level in the expander reached 630 cc on November 29, Dr. Wray recommended that Guilliams have surgery to receive another implant in her left breast.

On January 20, 2006, Dr. Wray examined Guilliams in preparation for the upcoming surgery. During that examination, Dr. Wray discovered that the expander had partially deflated. After refilling the expander, Dr. Wray informed Guilliams that she would need to be cleared by her family physician before undergoing the surgery. Guilliams did not return to Dr. Wray after the January 20 examination.

II. *Procedural History*

Based on the above-stated facts, Plaintiff filed a complaint against Defendants in April 2007. Her complaint included the following claims:

Count I (Medical Malpractice) alleges that Defendants were negligent in performing the April 22 surgery;

Count II (Informed Consent) alleges that Defendants were negligent in failing to obtain her informed consent for the June 9 surgery;

Count III (Breach of Contract) alleges that Defendants breached the parties' special oral agreement by leaving the sponge in her left breast;

Count IV (Fraud and Deceit) alleges that Defendants committed fraud by intentionally misleading her about the complications in her left breast and her legal rights regarding the sponge in order to persuade her to sign the release;

Count V (Constructive Fraud) alleges that Defendants worked a constructive fraud on her by providing her with incorrect facts about the complications in her left breast and her legal rights regarding the sponge so as to induce her to sign the release;

Count VI (Vicarious Liability) alleges that Lewis-Gale Clinic is vicariously liable for the conduct of Dr. Wray, Vaughn, and all other employees that were involved in her treatment or in the preparation of the release.

In response, Defendants now demur to Counts II, III, IV, and V, as well as to Plaintiff's claims for punitive damages and attorney's fees. They also move for partial summary judgment on Counts IV and V, or, in the alternative, a bifurcation of Plaintiff's negligence claims from her fraud claims.

## III. *Analysis*

### A. *Demurrers*

The function of a demurrer is to test the legal sufficiency of the claims stated in the challenged complaint. *Thompson v. Skate Am., Inc.*, 261 Va. 121, 126, 540 S.E.2d 123, 127 (2001). Although a demurrer does not admit the correctness of the complaint's conclusions of law, it does, as noted above, "admit[] the truth of all material facts that are properly pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred." *Id.* With these principles in mind, the Court considers Defendants' demurrers.

#### 1. *Virginia Medical Malpractice Act*

As a threshold matter, Defendants argue that Counts II, III, IV, and V of Plaintiff's Complaint must be dismissed because they assert claims for "malpractice" under the Virginia Medical Malpractice Act, Va. Code Ann. § 8.01-581.1 through 8.01-581.20:1 (the "Act"), and thus are subsumed by Count I (Medical Malpractice). The Court disagrees.

The Act applies to any claim for "malpractice" brought against a health care provider. "Malpractice," according to the Act, "means any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered . . . by a health care provider, to a patient." *Id.* § 8.01-581.1.

The Act further defines "health care" and "health care provider." "Health care" is defined as "any act, or treatment performed or furnished . . . by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment, or confinement." *Id.* And "health care provider" is defined as "a person, corporation, facility, or institution licensed by this Commonwealth to provide health care or professional services as a physician or hospital . . . registered nurse, or licensed practical nurse. . . ." *Id.*

Applying these definitions, there can be no doubt that the claims asserted in Counts II (Informed Consent) and III (Breach of Contract) are claims for "malpractice" under the Act. First, the acts that support the claims occurred while Plaintiff was receiving treatment from Defendants as a patient. Accordingly, she was receiving "health care" as defined by the Act. Next, the alleged tort and breach of contract are "for personal injuries . . . based on health care . . . rendered . . . to a patient," which, pursuant to the Act, constitutes "malpractice." Lastly, Defendants, as a physician, a hospital, and a nurse, clearly fall within the Act's definition of "health care provider."

Moving to the claims asserted in Counts IV (Fraud and Deceit) and V (Constructive Fraud), it is not as readily apparent that they are claims for "malpractice" under the Act. Plaintiff argues that they are not. And some courts in this Commonwealth have held that similar fraud claims are beyond the scope of the Act. *See, e.g., Glenn v. Trauben*, 70 Va. Cir. 446, 449-50 (Alexandria 2004) (finding that the plaintiff's fraud claims were not claims for "malpractice" under the Act, since the alleged misrepresentations took place before her treatment with the defendant began); *Dell v. French*, 38 Va. Cir. 91, 97-98 (Fairfax County 1995) (holding that "[f]raud, whether actual or constructive, to the extent it is based on purposeful misrepresentations of material fact related to a patient's care is a separate cause of action from medical malpractice); *Peterson v. Fairfax Hosp. Sys., Inc.*, 31 Va. Cir. 50, 58 (Fairfax County 1993) (finding that "the Medical Malpractice Act does not operate to limit liability for making a false statement . . . even where such a statement is made in the delivery of health care services). *But see Langford v. Kelly*, 54 Va. Cir. 310, 311 (Roanoke City 2000) (holding that the plaintiff's fraud claim fell within the Act's definition of "malpractice" because it was a

tort claim against a health care provider). The Court finds, however, that under the facts alleged, Plaintiff's fraud claims are claims for "malpractice" as contemplated by the Act.

As with Plaintiff's other claims, there is no question that she was receiving "health care" from Defendants when the acts supporting her fraud claims occurred. There is also no question that when the alleged fraud took place, Defendants were "health care providers." Thus, because Plaintiff's fraud claims are undoubtedly tort actions for personal injuries, the only thing left for the Court to determine is whether they are "based on health care . . . rendered," within the meaning of the Act.

The Supreme Court of Virginia has held that a claim is "based on health care" if it is "based upon conduct that was an inseparable part of the health care being rendered. . . ." *Hagan v. Antonio*, 240 Va. 347, 352, 397 S.E.2d 810, 812 (1990). In this case, Plaintiff alleges that Defendants committed fraud (either actual or constructive) by misrepresenting to her that the sponge had not caused the complications in her left breast and that therefore she had no legal claim against them for malpractice. She further alleges that they made these misrepresentations all with the intent of inducing her to sign the release and thereby limit their liability.

Given these allegations, the Court concludes that Plaintiff's fraud claims are based on conduct that was an inseparable part of the health care that was being rendered by Defendants. The Court reaches this conclusion because Defendants, as health care providers, owed a duty to Plaintiff to make reasonable disclosures of all significant facts regarding her treatment. *See Rizzo v. Schiller*, 248 Va. 155, 158-59, 445 S.E.2d 153, 155 (2002). This duty was an inseparable part of their standards of care and thus an inseparable part of the health care they rendered. *See Vann v. Harden*, 187 Va. 555, 47 S.E.2d 314 (1948) ("Upon consenting to treat a patient, it becomes [a physician's] duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed." (citation omitted)). It was this duty that they breached if, as she alleges, they (either intentionally or negligently) misrepresented to her that the sponge was not the cause of the complications in her left breast and that as a result she had no claim for malpractice, all with the intent of persuading her to sign the release and thereby limit their liability.

Since the claims that Plaintiff asserts in Counts II, III, IV, and V are claims for "malpractice," she must comply with the provisions of the Act. *See Turner v. Wexler*, 244 Va. 124, 126, 418 S.E.2d 886, 887 (1992). This does not mean, however, that all her claims are thus subsumed by Count I. Notwithstanding Defendants' argument to the contrary, there is nothing in the

Act that bars a party in a medical malpractice action from proceeding against a health care provider under more than one legal theory or cause of action. *See Power v. Alexandria Physicians Group, Ltd.*, 887 F. Supp. 845, 848 (E.D. Va. 1995); *Bulala v. Boyd*, 239 Va. 218, 228, 389 S.E.2d 670, 675 (1990).

Indeed, in the very case that Defendants cite in support of their argument, the plaintiff sued a physician claiming that he was negligent in performing her surgery and in failing to obtain her informed consent. *Tashman v. Gibbs*, 263 Va. 65, 69, 556 S.E.2d 772, 775 (2002). Although the Supreme Court of Virginia found that there was insufficient evidence to submit the informed consent claim to the jury, it did not find that the plaintiff was barred by the Act from asserting multiple claims as part of her medical malpractice action against the physician. *Id.* at 76, 556 S.E.2d at 779.

While the Act does not preclude a party in a medical malpractice action from bringing multiple "malpractice" claims against a health care provider, it does cap the amount of damages that he or she can recover. Va. Code Ann. § 8.01-581.15. Currently, the maximum amount that a party can recover in a medical malpractice action is $2 million. *Id.* This much was made clear by the Supreme Court of Virginia in *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670 (1990). There, the Supreme Court construed the Act "to mean that in a medical malpractice action, the total damages recoverable for a 'patient' are limited to the statutory amount, regardless of the number of legal theories upon which the claims are based." *Id.* at 228, 389 S.E.2d at 674.

Relying on this construction of the Act, the U.S. District Court for the Eastern District of Virginia, in *Power v. Alexandria Physicians Group, Ltd.*, 887 F. Supp. 845 (E.D. Va. 1995). provided the following explanation on how the cap functions when multiple "malpractice" claims are involved:

> The circumstances of an injury may give rise to a variety of distinct causes of action, each of which constitutes "an action for malpractice" under the [Act]. Some may be based on state common law, such as negligence or battery, while others may arise from federal statutes. . . . The standards, remedies, and purposes of the causes of action may differ markedly. Yet, the statute provides that a single $[2] million cap applies to all of a patient's "malpractice" claims, regardless of the particular body of law on which they are based.

*Id.* at 849.

Accordingly, in this case, although Plaintiff may proceed against Defendants under each of her "malpractice" claims, the total amount of damages she can recover is capped at $2 million under the Act. And this is

true even though she is suing multiple health care providers. *See Bulala*, 239 Va. at 228, 389 S.E.2d at 675; *Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87, 105, 376 S.E.2d 525, 534-35 (1989).

The Act does not bar Plaintiff from asserting more than one "malpractice" claim against Defendants in her medical malpractice action, and, consequently, the Court overrules Defendants' demurrers based on that ground.

### 2. *Fraud*

Defendants also demur to Counts IV (Fraud and Deceit) and V (Constructive Fraud) of Plaintiffs Complaint on four other grounds: (1) that the claims are based on expressions of opinion, not statements of fact; (2) that she did not rely on the alleged misrepresentations; (3) that she was not harmed by her alleged reliance; and (4) that the claims are prejudicial. The Court considers each of these grounds in turn.

To assert a cause of action for actual fraud, a plaintiff must prove by clear and convincing evidence the following six elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218, 618 S.E.2d 316, 321 (2005) (quoting *Prospect Devel. Co. v. Bershader*, 258 Va. 75, 85, 515 S.E.2d 291, 297 (1999)). "Constructive fraud requires proof, also by clear and convincing evidence, 'that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of . . . reliance upon the misrepresentation'." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 558, 507 S.E.2d 344, 347 (1998) (alteration in original) (quoting *Mortarino v. Consultant Eng'g Serv.*, 251 Va. 289, 295, 467 S.E.2d 778, 782 (1996)).

Defendants first contend that Plaintiff has failed to assert a cause of action for fraud, either actual or constructive, because the alleged misrepresentations were expressions of opinion, not statements of fact. In support of this contention, Defendants cite *Mortarino v. Consultant Engineering Services, Inc.*, 251 Va. 289, 467 S.E.2d 778 (1996). In that case, the Supreme Court of Virginia noted:

> It is well settled that a misrepresentation, the falsity of which will afford an action for damages, must be of an existing fact, and not the mere expression of an opinion. The mere expression

of an opinion, however strong and positive the language may be, is no fraud. Such statements are not fraudulent in law, because . . . they do not ordinarily deceive or mislead.

*Id.* at 293, 467 S.E.2d at 781 (alteration in original).

While it is true that the "mere expression of an opinion" does not give rise to an action for fraud, there is no "bright line test to ascertain whether false representations constitute matters of opinion or statements of fact." *Id.*, 467 S.E.2d at 781. Instead, "each case must in large measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances." *Id.*, 467 S.E.2d at 781 (quoting *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 562, 95 S.E.2d 207, 211 (1956)).

Here, Defendants assert that the alleged misrepresentations were expressions of opinion because they were offered as part of their diagnosis of Plaintiff's physical condition. In response, Plaintiff argues that, given the surrounding circumstances and respective positions of the parties, the alleged misrepresentations should be taken as statements of fact and not merely as expressions of opinion. In making this argument, Plaintiff relies on *Glenn v. Trauben*, 70 Va. Cir. 446 (Alexandria 2004), a fairly recent case from the Circuit Court of the City of Alexandria. There, Judge John E. Kloch ruled that a physician's opinion on the condition of a patient's spine could support an action for fraud. *Id.* at 448. In so ruling, Judge Kloch reasoned:

This Court can understand that doctors and other professionals may state opinion but, when they announce an opinion as to the condition of a subject area for which they are a trained and licensed professional, there must be some expectation that the patient may rely on that as a statement of fact. . . . Were this Court to ignore the special relationship between an untrained patient and a licensed physician, it would be remiss in following the directives of binding precedent. A physician describing, in his professional opinion, the state of his patient's physical condition holds a considerably superior position over the patient, who seeks medical treatment.

*Id.*

Defendants' alleged misrepresentations on the complications in Plaintiff's left breast and her legal rights regarding the sponge should be taken as statements of fact. This is so for several reasons.

To begin with, just as in *Glenn*, there existed a special relationship between Defendants (health care providers) and Plaintiff (patient). And that relationship placed Defendants in a superior position over Plaintiff. Consequently, she could reasonably be expected to rely on their alleged misrepresentations regarding the complications in her left breast. Next, Defendants' alleged misrepresentations extended beyond their diagnosis of Plaintiff's physical condition; they included statements regarding her legal rights with respect to the sponge. Most significantly, Defendants intended the alleged misrepresentations to be understood as statements of fact so as to induce Plaintiff to sign the release.

Defendants next argue that Plaintiff did not rely on their alleged misrepresentations and, even if she did, she suffered no harm from her reliance. Responding, Plaintiff contends that Defendants' argument is inappropriate at this stage of the litigation because it goes beyond her complaint. The Court agrees with Plaintiff.

As noted above, the function of a demurrer is to test the legal sufficiency of the claims stated in the challenged complaint. As a result, the Court can only consider the factual allegations contained in Plaintiff's complaint. In so doing, the Court concludes that Plaintiff has sufficiently pleaded that she relied on Defendants' alleged misrepresentations and that her reliance caused her to suffer harm.

Finally, Defendants contend that Plaintiff's fraud claims should be dismissed because they are prejudicial. The reason for this, according to Defendants, is that "[w]ith the withdrawal of the release and accord and satisfaction defenses, the fraud claims and the facts surrounding them have no relevance to the issues of this case." Defs.' Mem. in Supp. of Dem. II, 9. The Court disagrees with Defendants' argument because, as pleaded, Plaintiff's fraud claims do not depend on their reliance on the release as a defense. Thus, Plaintiff's fraud claims are not prejudicial to Defendants.

In sum, the Court finds (1) that Defendants' alleged misrepresentations were statements of fact, (2) that Plaintiff has sufficiently pleaded that she relied on those alleged misrepresentations and that her reliance caused her to suffer harm, and (3) that Plaintiff's fraud claims are not prejudicial to Defendants. Accordingly, the Court overrules Defendants' demurrers based on those grounds.

### 3. Punitive Damages

Next, Defendants demur to Plaintiff's claim for punitive damages, arguing that she has failed to allege the necessary facts to support such a claim. In response, Plaintiff contends that her allegations of fraud and deceit are sufficient to support her claim for punitive damages.

In an action for fraud, the Supreme Court of Virginia has held that "punitive damages may be recovered only if there is proof, either direct or circumstantial, showing actual malice." *Jordan v. Suave*, 219 Va. 448, 453, 247 S.E.2d 739, 741 (1978). A party may establish "[a]ctual malice by showing that [the defendant's] action was prompted by ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another." *Id.* at 452, 247 S.E.2d 741 (quoting *Lee v. Southland Corp.*, 219 Va. 23, 27, 244 S.E.2d 756, 759 (1978)).

In her complaint, Plaintiff alleges that Defendants intentionally misrepresented to her that the sponge had not caused the complications in her left breast and that, as a result, she had no legal claim against them for malpractice. She further alleges that Defendants made these misrepresentations all with the intent of persuading her to sign the release and thereby limit their liability. These allegations, if proved, would be sufficient to establish that Defendants' conduct "was prompted by ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another." As a result, the Court overrules Defendants' demurrer.

### 4. Attorney's Fees

Finally, Defendants demur to Plaintiff's claim for attorney's fees. They argue that she has failed to allege the necessary facts to support such a claim. The Court disagrees.

"Generally, absent a specific contractual or statutory provision to the contrary, attorney's fees are not recoverable by a prevailing litigant." *Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 449, 403 S.E.2d 334, 335 (1991) (citations omitted). There are, however, certain exceptions to this rule, one of which applies here. In *Prospect Devel. Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291 (1999), the Supreme Court of Virginia held that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party." *Id.* at 93, 515 S.E.2d at 301.

Thus, because Plaintiff has alleged sufficient facts to support her fraud claims, the Court finds that she has alleged sufficient facts to support her claim for attorney's fees. Accordingly, the Court overrules Defendants' demurrer.

## B. *Motion To Bifurcate*

Defendants also move to bifurcate Plaintiffs fraud claims from her negligence claims. They contend that trying these claims together would be prejudicial to them and would cause jury confusion. Responding, Plaintiff argues that the claims should not be bifurcated, since it "would require extensive duplication of evidence and resources for the parties and the Court and would not be in the interests of judicial economy." Pl.'s Mem. in Opp'n to Defs.' Mot. to Bifurcate 3.

According to Va. Code § 8.01-272, "[t]he court, in its discretion, may order a separate trial for any claim." "In making this decision," the Supreme Court of Virginia has stated, "a trial court must be cautious to insure that separating . . . claims for trial does not prejudice the substantial rights of any party." *Allstate Ins. Co. v. Wade*, 265 Va. 383, 392, 579 S.E.2d 180, 185 (2003). Further, "[w]hen considering a request for separate trials, the trial court must also consider any resulting unnecessary delay, expense, or use of judicial resources that would flow from separate trials of the claims at issue." *Id.*, 579 S.E.2d at 185.

Upon considering these factors, the Court finds that the benefits of bifurcating the claims would not outweigh the costs. As a result, the Court denies Defendant's motion.

## C. *Motion for Leave To Amend Complaint*

In response to Defendants' demurrers, Plaintiff filed a motion for leave to amend her complaint. Defendants oppose that motion, arguing that, if granted, it would be prejudicial to them because the trial date, which is now set for October 5, is fast approaching.

The Supreme Court of Virginia has "consistently held that the decision to permit amendments of pleadings rests within the sound discretion of the circuit court." *Peterson v. Castano*, 260 Va. 299, 302, 534 S.E.2d 736, 738 (2000). And Rule 1:8, in relevant part, states that "[l]eave to amend shall be liberally granted in the furtherance of the ends of justice."

To be sure, the trial date is fast approaching. The Court finds, however, that Defendants will not be prejudiced if Plaintiff is granted leave to amend her complaint. This is so for at least two reasons. First, the amendments that Plaintiff proposes only augment existing claims; they do not add new ones. Second, in light of the Court's ruling on their demurrers, it is unlikely that Defendants will find it necessary to file new dispositive motions. Accordingly, the Court grants Plaintiff's motion for leave to amend her complaint.

## IV. *Conclusion*

For the reasons stated, the Court overrules Defendants' demurrers, takes under advisement their motion for partial summary judgment, and denies their motion to bifurcate. The Court also grants Plaintiff's motion for leave to amend her complaint.