Present: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Koontz, S.J.

EMERALD POINT, LLC, ET AL.

OPINION BY
v. Record No. 161339          SENIOR JUSTICE LAWRENCE L. KOONTZ, JR.
                                    December 28, 2017
LINDSEY HAWKINS, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

This appeal arises from a jury verdict in favor of the tenants of an apartment in a

premises liability action against the defendants, their landlord and its management company, for

injuries alleged to have been caused by carbon monoxide ("CO") poisoning.[1]

BACKGROUND

Familiar principles of appellate review guide our analysis in this case. As the prevailing

parties in the trial court, the plaintiffs are entitled to have the evidence and all inferences

reasonably drawn from it viewed in the light most favorable to them. *Norfolk S. Ry. Co. v.

Rogers*, 270 Va. 468, 478, 621 S.E.2d 59, 65 (2005). Indeed, as they come armed with a jury

verdict approved by the circuit court, the plaintiffs occupy the "most favored position known to

the law." *Bennett v. Sage Payment Solutions, Inc.*, 282 Va. 49 54, 710 S.E.2d 736, 739 (2011)

---

[1] In the record there are multiple references to "$CO_2$" which is the chemical symbol for carbon dioxide. Carbon *monoxide*, CO, and carbon *dioxide*, $CO_2$, are both by-products of thermo-chemical reactions in which carbon and oxygen are present, and the terms are readily confused by laypersons. In the combustion process within a natural gas furnace, both CO and $CO_2$ are produced. While excess concentrations of either can be dangerous to human life and health, an excess amount of CO is the greater concern and is most commonly measured in inspecting for malfunctions in a heating system. *See*, *e.g.*, *Am. Nat'l Prop. v. Wyatt*, 400 S.W.3d 417, 425 (Mo. Ct. App. 2013); *Langone v. Am. Family Mut. Ins. Co.*, 731 N.W.2d 334, 340 (Wis. App. 2007). Because it is not disputed that only carbon monoxide poisoning is at issue in this case, we have presumed that references in the record to "$CO_2$" are intended to be to "CO" and will make the appropriate emendation when quoting from the record where necessary.

(internal quotation marks omitted). In this context, and because the issues raised by the landlord and its management company on appeal are limited to challenging specific rulings of the trial court, initially we shall recite only the record evidence necessary to establish the foundation for our analysis of those asserted errors.

Lindsey Hawkins, Paul Harmon, Thomas Zamaria, and Edward Guire (collectively, the "tenants") were co-tenants of the apartment unit located at 2163 Dumbarton Drive in the Emerald Point Apartments in Virginia Beach (the "City"), which is managed by The Breeden Company, Inc. ("Breeden") for the owner, Emerald Point, LLC. The unit was heated by a natural gas furnace. On the evening of November 26, 2012, the alarm in the carbon monoxide detector in the unit sounded. A maintenance worker sent by Breeden later that night replaced the batteries in the device, indicating to the tenants that he believed the alarm was merely due to low battery power in the detector, rather than a malfunction in the furnace. Shortly after the maintenance worker left, however, the alarm sounded again.

The following morning, Hawkins called Virginia Natural Gas ("VNG") about the alarm. VNG dispatched an inspector, Charles Basnight, to the apartment. Basnight measured the CO levels in the apartment at 37 parts per million ("ppm"), a rate significantly higher than the normal range and hazardous to human health. Basnight then turned off the gas supply to the furnace and "red tagged"[2] it as the suspected source of the CO leak. On the red tag Basnight indicated that the issue might be a cracked heat exchanger in the furnace.

---

[2] "Red tagging" is a term used in the natural gas industry to indicate that a gas meter or gas appliance has been determined by a code enforcement official to be malfunctioning and constitutes a hazard to human health. When a device has been red tagged, its gas supply is shut off and it is not to be used until the malfunction has been corrected and the device has been determined to be in proper working order and no longer a hazard. *See*, *e.g.*, *Hegwood v. Virginia Nat. Gas*, 256 Va. 362, 365-66, 505 S.E.2d 372, 374-75 (1998); *Banks v. Richmond*, 232 Va. 130, 138-39, 348 S.E.2d 280, 285 (1986) (Stephenson, J., dissenting).

2

Later that day, Breeden sent maintenance worker Calvin Morris to the tenants' apartment to assess the problem. Morris declared on a City code enforcement corrective action form that he had "[c]hecked furnace for CO[] leaks, checked vent pipes for leaks, found vent pipe in attic to 2163, loose[.] Reattached and secured, rechecked CO[] level it was at 0."

Although not licensed to make repairs to heating systems, Morris repaired the vent pipe by using zip screws to secure the sections of the pipe together, which is contrary to manufacturer specifications. Morris later returned to the apartment with Danny Carlson, a code enforcement officer from the City, who likewise determined that the CO levels were within the acceptable range. Carlson did not go into the attic or otherwise inspect the furnace, flue or vents. Carlson then permitted the red tag to be removed from the furnace.

In the early morning hours of January 4, 2013, the alarm in the apartment's carbon monoxide detector sounded again. Although a maintenance worker found no elevated CO readings when sent to the apartment, later that day a VNG inspector found that the CO readings were beyond the acceptable range and again red tagged the furnace.

The same day, Breeden hired a heating and air conditioning contractor to replace the furnace. However, once the new furnace was installed, the CO levels in the tenants' apartment remained high. An inspection in the attic above their apartment resulted in the discovery that the flue of the furnace in the adjoining apartment was not properly connected and was venting exhaust, including CO, into the attic. When this flue was repaired, CO levels in the tenants' apartment returned to an acceptable level.

For purposes of this appeal, it is not disputed that the tenants suffered injuries from being exposed to CO gas. Harmon, Zamaria and Guire suffered relatively minor injuries, while Hawkins' injuries were of a more extensive and permanent nature.

3

On November 13, 2014, the tenants filed a joint complaint against Breeden and Emerald Point, LLC (hereafter collectively, the "landlord") in the Circuit Court of the City of Virginia Beach. Alleging that the CO exposure resulted from faulty maintenance of the furnace and the associated vent and flue system and that this exposure resulted in their injuries, Harmon, Zamaria and Guire each sought $100,000 in compensatory damages and $350,000 in punitive damages. Hawkins sought $5,000,000 in compensatory damages and $350,000 in punitive damages. The claims for punitive damages were based on an assertion that the landlord had been willful and wanton in failing to maintain the furnace and in failing to employ competent staff.

At the conclusion of the presentation of the evidence at a four-day trial held from May 16 through May 19, 2016, the circuit court ruled that the tenants had failed to establish the requisite level of negligence for punitive damages. Harmon, Zamaria and Guire then were permitted, over the objection of the landlord, to increase their ad damnum prayers for compensatory damages to $450,000. The jury returned its verdicts for the tenants, awarding Harmon, Zamaria and Guire $200,000 each and $3,500,000 to Hawkins. The court entered final judgment in accord with the jury's verdicts in an order dated June 17, 2016. This appeal followed.

DISCUSSION

We awarded the landlord an appeal on the following assignments of error:

1. The Trial Court erred in admitting the testimony of Dr. Allan Lieberman that had not been disclosed in accordance with Rule 4:1(b)(4)(A)(i).

2. The Trial Court erred in granting an adverse inference jury instruction based on the disposal of the furnace because there was no finding of bad faith, the Defendant had no reason to foresee that the furnace would be material evidence in litigation because all of the evidence indicated the leaks were from the flue pipes, and Plaintiffs failed to present evidence that the furnace was material.

4

3. The Trial Court erred in admitting the irrelevant and prejudicial testimony of Alan Moore regarding alleged defects in the installation of the new furnace and piping, where such defects were after-the-fact and patently not the cause of the carbon monoxide leak.

4. The Trial Court erred in overruling Defendants' Motion to Drop Misjoined parties where each of the four plaintiffs had distinct and independent claims against the Defendants.

5. The Trial Court erred in granting Plaintiffs' motion to increase the ad damnum after the close of the evidence and over Defendants' objection.

6. The Trial Court erred in failing to set aside the verdicts for each of the Plaintiffs as excessive or, in the alternative, reducing the verdicts or ordering a new trial on damages.

We will address these issues *seriatim*.

*First Assignment of Error – Testimony of Dr. Allan Lieberman*

In a pre-trial scheduling order dated October 15, 2015, the circuit court directed that "all information discoverable under Rule 4:l(b)(4)(A)(i) of the Rules of Supreme Court of Virginia shall be provided or the expert will not ordinarily be permitted to express any non-disclosed opinions at trial." Subsequently, in interrogatories served on the tenants, the landlord, essentially tracking the provisions of Rule 4:1(b)(4)(A), requested that they "[i]dentify each expert who you expect to testify at the trial of this matter, stating the substance of the facts and opinions to which each expert is expected to testify and give a summary of the grounds of each opinion including its factual basis." Among other medical providers, Allan Lieberman, M.D., a specialist in environmental medicine and toxicology and one of Hawkins' treating physicians, was designated as an expert witness. The expert designation of Dr. Liebermann incorporated by reference a compact disc containing the medical records of each of the tenants and Dr. Lieberman's *curriculum vitae*.

5

The landlord took Dr. Lieberman's discovery deposition, and the parties then took a *de bene esse* video deposition for use at trial. In a post-trial order dated June 17, 2016, the circuit court memorialized its prior rulings on objections raised by the landlord to various statements in Dr. Lieberman's testimony in the *de bene esse* deposition. As relevant to this appeal, certain of these objections asserted that the facts and opinions stated by Dr. Lieberman had not been adequately disclosed in response to the interrogatories propounded to the tenants.[3] The circuit court overruled all of these objections.

The landlord properly concedes that the circuit court's ruling on the admissibility of testimony, whether expert or lay, is subject to review for an abuse of the court's discretion. *Hyundai Motor Co. v. Duncan*, 289 Va. 147, 155, 766 S.E.2d 893, 897 (2015). However, when the issue is whether a fact or opinion which is the subject of expert testimony has been adequately disclosed in response to a proper discovery inquiry under Rule 4:1(b)(4)(A)(i), the "application of this rule begins with determining whether the opinion at issue was disclosed in any form." *John Crane, Inc. v. Jones*, 274 Va. 581, 591, 650 S.E.2d 851, 856 (2007). The designation of the expert witness must also disclose the "substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Rule 4:1(b)(4)(A)(i); *see also John Crane*, 274 Va. at 592-93, 650 S.E.2d at 856-57 (exclusion

---

[3] There is no contention in this case that the tenants made any attempt to supplement their initial expert opinion disclosure pursuant to Rule 4:1(e). Unlike the comparable provisions of Federal Rule of Civil Procedure 26(e), there is no language in the supplementation provisions of Rule 4:1(e) indicating that the deposition itself is a form of disclosure that expands the scope of opinions a retaining party may elicit from the witness. Here, despite the fact that two depositions were taken, and use of the *de bene esse* testimony at trial was clearly contemplated by the parties, no written supplementation of the Rule 4:1(b)(4)(A)(i) disclosure regarding Dr. Lieberman's expected testimony was undertaken, nor was leave for such expansion of the scope of testimony sought by pretrial motion.

affirmed where defendant identified topic of the expert's testimony but not the substance of the expert's opinions). Here, the landlord contends that the circuit court's ruling pertaining to Dr. Lieberman's testimony was in error because the record does not support the court's determination that the substance of that testimony was adequately disclosed pursuant to Rule 4:1(b)(4)(A)(i). Accordingly, the landlord contends that the circuit court abused its discretion by permitting aspects of Dr. Lieberman's testimony not adequately disclosed in the tenants' response to interrogatories to be included in the edited video played for the jury.[4] We agree.

During his deposition, Dr. Lieberman stated that he had read "in a very recent paper" that "the long-term effect of people who have been exposed to carbon monoxide is that of dementia. A much, much higher percentage of people developed dementia later on in life." However, in the materials provided in response to the landlord's interrogatories, there is only one reference to dementia, which is found in treatment notes for Hawkins, recommending that she take a nutritional supplement that has been found useful "even when dementia already exists." Nowhere in the response to interrogatories, as required by the court's pre-trial scheduling order, did the tenants indicate that Dr. Lieberman would rely on specific scholarly articles, treatises or texts. Moreover, there is no contention that the tenants disclosed 30 days prior to trial the dementia study as required by Virginia Rule of Evidence 2:706(a), and hence there is no

---

[4] On brief, the tenants contend that the landlord has waived its objection to all but one of Dr. Lieberman's statements as being outside the scope of the disclosure in the response to the interrogatories. However, contrary to the tenants' assertion, the June 17, 2016 order clearly reflects that the circuit court ruled on multiple objections based upon the assertion of inadequate disclosure in the response to interrogatories. Because the order also identifies the statements by reference to the page and line number of the transcript of the deposition, we conclude that the objections were made and that the court had an opportunity to rule upon them. This, without more, is sufficient to preserve for appeal the question whether the court's ruling was proper. *See*, *e.g.*, *Kellermann v. McDonough*, 278 Va. 478, 491, 684 S.E.2d 786, 792 (2009).

contention that this evidence rule justified impromptu reference to the dementia study. Accordingly, we hold that Dr. Lieberman's opinion that persons exposed to carbon monoxide poisoning are at greater risk for developing dementia was not disclosed in any form in the pre-trial discovery and that the circuit court erred in overruling the landlord's objection to this statement.

Similarly, Dr. Lieberman testified that in a study of Japanese coal miners, "59% of those miners still had almost a daily headache 33 years later after the initial exposure" to carbon monoxide. Thus, he opined that the effects of carbon monoxide poisoning were subject to a "latency" period and "just because you don't see something manifesting initially" symptoms could develop later in life. However, there was no disclosure in the tenants' responses to the interrogatories that Dr. Lieberman would testify that the effects of carbon monoxide poisoning were subject to a "latency" period and that the tenants would potentially develop new symptoms after a period of latency. Accordingly, we hold that the circuit court erred in not sustaining the landlord's objection to this statement.

In its pre-trial scheduling order, the circuit court in this case specifically indicated that the failure to adequately disclose an expert's expected testimony could result in the expert not being "permitted to express any non-disclosed opinions at trial." In *John Crane*, we approved the exclusion of non-disclosed opinion testimony as being within the trial court's discretion. 274 Va. at 591-93, 650 S.E.2d at 856-57. Similarly, in *Mikhaylov v. Sales*, 291 Va. 349, 360-61, 754 S.E.2d 286, 292 (2016), we held that a trial court abused its discretion in permitting expert testimony not disclosed in accordance with the pre-trial scheduling order. Here, we are of opinion that the previously undisclosed opinions in Dr. Lieberman's trial testimony were

8

prejudicial to the landlord and, thus, the court's error in not sustaining the landlord's objections was not harmless.

For these reasons, we will set aside the jury's verdicts and remand the case for a new trial. Although we will reverse under the first assignment of error, we will examine here the remaining assignments of error raised by the landlord to resolve issues that are likely to arise in a new trial on remand. *See*, *e.g.*, *Cain v. Lee*, 290 Va. 129, 136, 772 S.E.2d 894, 897 (2015) (citing *Harman v. Honeywell Int'l, Inc.*, 288 Va. 84, 95-96, 758 S.E.2d 515, 522 (2014)) (considering evidentiary issues that would probably arise on remand where the judgment was reversed on other grounds).

*Second Assignment of Error – Spoliation Instruction*

After the old furnace was removed from the tenants' apartment on January 4, 2013, it was stored by the landlord in a maintenance bay for more than one year and was later disposed of well before the November 13, 2014 date when the complaint in the present action was filed. In a motion filed May 2, 2016, the tenants sought a jury instruction which would have directed the jury to accept as an undisputed fact that the furnace had a "burned through" combustion chamber and that this was the principal source of CO entering their apartment. The circuit court declined to make such a specific and mandatory instruction, but nonetheless decided to give, over the landlord's objection, the following spoliation instruction: "If a party has exclusive possession of evidence which a party knows, or reasonably should have known would be material to a potential civil action and the party disposes of that evidence, then you may infer, though you are not required to do so, that if that evidence had been available it would be detrimental to the case of the party that disposed of it[]. You may give such inference whatever force or effect you think is

appropriate under all the facts and circumstances." In explaining its decision to give the spoliation instruction, the court stated that the landlord "did nothing in bad faith" in disposing of the furnace.

Spoliation of evidence occurs when a party is aware that there is pending or probable litigation involving evidence in the party's custody or under its control, and such evidence if destroyed or otherwise not preserved will interfere with the ability of the adverse party to establish some element of its claim. *See Austin v. Consolidation Coal Co.,* 256 Va. 78, 81-82, 501 S.E.2d 161, 162 (1998). Although we have considered issues of spoliation in previous cases, *see*, *e.g.*, *Allied Concrete Co. v. Lester*, 285 Va. 295, 308, 736 S.E.2d 699, 705 (2013), this case presents as an issue of first impression whether to warrant remedial action by the trial court, such as the granting of an adverse inference instruction, the destruction of the evidence must be undertaken with the deliberate intent to deprive the other party of its use at trial in a pending or reasonably foreseeable litigation between the parties.

In *Allied Concrete*, the party's intentional misconduct was evident on its face, whereas in this case, the circuit court made an express finding that the destruction of the furnace did not result from "bad faith." Accordingly, we must determine whether a party who is either aware or should reasonably be aware of the relevance of evidence in its possession or under its control to either probable or pending litigation, and fails to preserve such evidence without bad faith shall be penalized by having the jury instructed that it may infer that the missing evidence would have been unfavorable to that party.

The landlord contends that the circuit court erred in giving the spoliation instruction on two grounds. First, the landlord contends that a spoliation instruction is not permissible when

10

the record demonstrates that the party charged with failing to preserve the evidence was not reasonably on notice that the evidence was likely to be the subject of litigation. The landlord's second contention raises the question whether, in the absence of an express finding that the responsible party acted in bad faith by failing to preserve evidence with deliberate intent to deprive the other party of its use at trial, a spoliation instruction is appropriate.

The landlord is correct that remedial action by the trial court, such as granting a spoliation instruction, will not be warranted unless the party seeking the instruction has offered evidence from which the trial judge can conclude that rational jurors could find that the party failing to preserve the evidence knew, or reasonably should have known from the totality of the circumstances, that the evidence was likely to be material in probable or pending litigation. In this case, however, because we are of opinion that the resolution of the landlord's second contention is dispositive, we need not address the issue whether the evidence was sufficient to establish that the landlord was reasonably on notice that the evidence of the condition of the furnace was likely to be the subject of litigation.

We have not yet had the opportunity to address in detail the standard under which an instruction or other relief for spoliation of evidence may be imposed. In *Gentry v. Toyota Motor Corp.*, 252 Va. 30, 34, 471 S.E.2d 485, 488 (1996), we held that a circuit court erred in granting a spoliation motion and dismissing the cause of action where the record showed that the destruction of the evidence was undertaken by a third party and that there had been no "bad faith" by the party in control of the evidence. However, we were not called upon to address in *Gentry* whether some lesser sanction would be appropriate because the party in control of the evidence failed to prevent the third party from having access to and damaging the evidence.

11

Thus, we are presented here with a case of first impression as to whether a spoliation instruction allowing the jury to make a permissible inference that the missing evidence would have been unfavorable to the party charged with its preservation is appropriate where there is no "bad faith" associated with the loss of the evidence.

In federal court cases involving spoliation of electronically stored information, Federal Rule of Civil Procedure 37(e)(2)(B) has since December 1, 2015 required a finding by the court that a party acted with the intent to deprive another party of the use of that information in the litigation before an adverse inference instruction may be given to the jury. This requirement applies whether the jury is instructed that "it may" or "it must" presume the electronic information was unfavorable to the other party. Fed.R.Civ.P. 37(e)(2)(B).

Advisory notes to the amendment of this rule provide clear insight to its application and are helpful to our considerations in this case:

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have.

Advisory Committee Notes to Rule 37(e) (2015 Amendment). Long before the adoption of the spoliation provisions now applicable in responding to destruction of electronically stored information in the federal system, several federal courts applying common law principles had held that an adverse inference instruction and certain other sanctions for spoliation are proper only where the party has acted in bad faith or with intentional conduct calculated to suppress the truth. *See*, *e.g.*, *Bull v. United Parcel Serv. Inc.*, 665 F.3d 68, 79 (3d Cir. 2012); *King v. Ill. Cent.*

12

*R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008); *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003).

While we recognize that the current federal procedure rule was developed specifically to address electronic evidence, we are of opinion that the standard it sets forth and the rationale underlying it as stated in the Advisory Committee Notes are persuasive. We are further of opinion that the resolution of a spoliation issue in the Commonwealth should be guided by the same standard and applicable to all forms of spoliation evidence. Accordingly, we hold that the evidence must support a finding of intentional loss or destruction of evidence in order to prevent its use in litigation before the court may permit the spoliation inference. In short, we agree that "[t]o allow such a severe sanction as a matter of course when a party has only negligently destroyed evidence is neither just nor proportionate." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 24 (Tex. 2014).

We emphasize that in any case where a spoliation instruction is considered the determination that a party intentionally failed to preserve evidence in order to prevent its use in litigation where the party knew or reasonably should have known under the totality of the circumstances that the evidence would be material in a pending or reasonably probable litigation is highly fact specific. In this case, however, the evidence showed that the furnace was disposed of only after it sat for more than one year in a maintenance bay before being discarded. This action by the landlord resulted at worst from negligence, and the tenants did not demonstrate that it was motivated by any desire to deprive them of access to the furnace as material evidence in probable litigation.

Accordingly, we hold that the circuit court erred in granting the spoliation instruction and direct that in the retrial of this case if the evidence is similar the tenants will not be entitled to a spoliation instruction with regard to their inability to inspect the furnace.

*Third Assignment of Error – Testimony of Alan Moore[5]*

The landlord asserts that the circuit court erred in permitting Alan Moore, an inspector for the City, to testify regarding the installation of the new furnace. On January 18, 2013, Moore determined that the installation of the new furnace was improper because the City had not issued a work permit to the contractor which had installed it. The contractor obtained the required permit shortly after Moore's first inspection. However, when Moore reinspected the installation of the furnace, he found several code violations and required the contractor to make corrections. The furnace passed inspection on January 28, 2013.

The landlord contends that the admission of Moore's testimony regarding the contractor's failure to obtain the permit and the code violations in the installation of the new furnace were not materially relevant to the determination of the injuries suffered by the tenants from the intrusion of CO into their apartment prior to the installation of the furnace. The landlord thus contends that it was prejudiced by this testimony. The tenants respond that the testimony was relevant to show the landlord's course of negligent maintenance of the heating and venting and disregard for their safety.

We conclude on this record that Moore's testimony was prejudicial because it involved matters collateral to the determination of the landlord's liability for the tenants' injuries. The

---

[5] Within the record, Moore's surname is sometimes given as "More;" we have adopted the spelling used in the assignment of error.

tenants did not contend that the new furnace failed to perform as intended or that any of the code violations resulted in their being exposed to CO gas. Moreover, contrary to the tenants' assertion, the failure of the contractor to obtain the required permit was not evidence of any neglect on the part of the landlord, as obtaining the permit was the duty of the contractor. Accordingly, we hold that on remand Moore's testimony shall be excluded in any retrial as lacking relevance.

*Fourth Assignment of Error – Severance Motion*

Prior to trial, the landlord filed a motion pursuant to Code § 8.01-5 to sever Hawkins' claim from that of the other three tenants.[6] The landlord essentially contends that the evidence of the severity of Hawkins' injuries was unduly prejudicial with respect to the jury's consideration of the evidence concerning the relatively minor injuries suffered by Harmon, Zamaria and Guire. The tenants respond that the circuit court properly denied the motion for severance because their injuries arose out of the same tortious wrongs of the landlord.

> Trial courts have the inherent authority to consolidate claims for trial and have been given specific authority to order separate trials in certain circumstances. A decision to order separate trials or to consolidate claims for a single trial is a matter of procedure, left to the trial court's discretion. In making this decision, a trial court must be cautious to insure that separating or consolidating claims for trial does not prejudice the substantial rights of any party. When considering a request for separate trials, the trial court must also consider any resulting unnecessary delay, expense, or use of judicial resources that would flow from separate trials of the claims at issue. In reviewing the trial court's ruling regarding consolidation or separation of trials, we will not alter the ruling unless the trial court plainly abused its discretion.

---

[6] No issue has been raised in this action about the propriety of four personal injury plaintiffs joining as co-plaintiffs in a single lawsuit (as opposed to bringing four separate actions subject to consolidation in the discretion of the trial court). We therefore view the issue as to whether severance was required for three of the four claims that had otherwise been properly consolidated for hearing in a single action.

15

*Allstate Ins. Co. v. Wade*, 265 Va. 383, 392, 579 S.E.2d 180, 185 (2003) (citations omitted). On the record before us, we cannot say that the circuit court plainly abused its discretion in not ordering the severance of Hawkins' claims from those of the other three tenants. Accordingly, we will affirm the court's ruling denying the severance motion.

*Fifth Assignment of Error – Amendment of the Ad Damnum Prayers*

As indicated above, after the close of all the evidence in the trial, the landlord having offered no evidence, the circuit court struck the claims for punitive damages, and then it permitted Harmon, Zamaria and Guire to amend their ad damnum prayers for compensatory damages from $100,000 to $450,000. In *Whitley v. Booker Brick Co.*, 113 Va. 434, 74 S.E. 160 (1912), we stated that "'it is in the discretion of the court, at any time before verdict is rendered, to allow amendments of the pleadings which will operate in favor of justice.'" *Id*. at 437, 74 S.E. at 162 (quoting 1 C. Robinson, The Practice in the Courts of Law and Equity in Virginia 233 (1832)). Thereafter, in *Russell Lumber Co. v. Thompson*, 137 Va. 386, 392-94, 119 S.E. 117, 119-120 (1923), we held that where there was an opportunity for the defendant to offer responsive proof, or to be granted a continuance – ad damnum amendment motions late in the trial while the evidence was still being introduced should have been granted under the Virginia doctrine of liberal amendment, but that amendment after the close of all the evidence denies the defense (and the court) a fundamental understanding of the issues in the case, and would "promote injustice."

Thus, it was error for the trial court in the present case to permit amendment of the ad damnum prayers of Harmon, Zamaria and Guire after the completion of all of the evidence, and we can perceive no rationale for considering their failure to make out a claim for punitive

16

damages as a justification for that ruling.  However, we have also held that when a case is remanded for a new trial it is presented anew.  *See Rodriguez v. Leesburg Bus. Park, LLC*, 287 Va. 187, 199 n.4, 754 S.E.2d 275, 281 (2014); *Nassif v. Board of Supervisors*, 231 Va. 472, 480, 345 S.E.2d 520, 525 (1986) ("When this Court rules that the judgment of a trial court is erroneous . . . it is no longer viable.  Unless we say otherwise, the slate is wiped clean, with the result that on remand the parties begin anew").  Thus, if they are so advised, on remand Harmon, Zamaria and Guire may seek leave to amend their ad damnum prayers before commencement of a new trial, and we decline to express an advisory opinion on whether such a motion if made, should be granted.

*Assignment of Error Six – Motions to Set Aside Jury Verdicts as Excessive*

The thrust of the landlord's final assignment of error concerns the circuit court's denial of the landlord's post-verdict motions to set aside the jury verdicts in favor of each of the tenants as excessive or in the alternative to remit the damages or grant a new trial.  This issue is moot in light of our reversal of the court's judgment on other grounds.

CONCLUSION

Having determined that there were multiple reversible errors in the trial of this case, we must determine the scope of the issues that will be the subject of a new trial on remand.  In that regard, we cannot say that the erroneous admission of portions of Dr. Lieberman's testimony would have impacted only the jury's determination of the plaintiffs' damages.  Additionally, the admission of Moore's testimony and the erroneous spoliation instruction could well have affected the liability decision by the jury.  We recognize that where the evidence on liability is "close, and the improper evidence may have tipped the scales" in favor of finding against the defendants, "[w]e cannot say . . . that the error was harmless." *Agelasto v. Frank Atkinson Real*

17

*Estate*, 229 Va. 59, 65, 327 S.E.2d 84, 87 (1985); *see also PTS Corp. v. Buckman*, 263 Va. 613, 621-23, 561 S.E.2d 718, 723-24 (2002); *Wilson v. Whittaker*, 207 Va. 1032, 1039, 154 S.E.2d 124, 129 (1967). In the present case, therefore, we cannot conclude that these errors did not affect the jury's determination of liability as well as its awards of damages.

For the reasons set forth above, we will reverse the circuit court's judgment and remand the case for a new trial on all issues, consistent with the views expressed in this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*