COURT OF APPEALS OF VIRGINIA

Present:   Judges Friedman, Frucci and Senior Judge Humphreys
Argued at Fredericksburg, Virginia

UNPUBLISHED

PAUL N. MULLIS

MEMORANDUM OPINION* BY
v.        Record No. 1219-23-4            JUDGE ROBERT J. HUMPHREYS
                                          AUGUST 13, 2024

RUSSELL EDWARD MCDOW, JR., MD, ET AL.


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
James E. Plowman, Jr., Judge

James P. Campbell (Matthew L. Clark; Campbell Flannery, PC, on
briefs), for appellant.

Noelle Quam (C.J. Steuart Thomas, III; TimberlakeSmith, on brief),
for appellees.


Paul N. Mullis appeals the final order dismissing his medical malpractice suit against

Dr. Russell E. McDow, Jr., and Loudoun Medical Group, P.C., following a jury defense verdict.  He

argues the circuit court erred in overruling his objections to expert testimony, in denying his motion

for summary judgment, and in refusing his offered jury instruction.

## BACKGROUND[1]

Dr. Satinder Gill, a gastroenterologist, started treating Mullis in 2008 for multiple

symptoms including abdominal pain, vomiting, and blood in the stool.  Mullis suffered from

hemochromatosis, a liver disease, for which he also sought treatment from a hematologist, as

well as diabetes and fatty liver disease.  Mullis's abdominal pain and vomiting would occur after

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] "In reviewing the evidence presented at trial, we view it 'in the light most favorable to
the prevailing party, granting it the benefit of any reasonable inferences.'" *Pergolizzi v.
Bowman*, 76 Va. App. 310, 317 n.1 (2022) (quoting *Starr v. Starr*, 70 Va. App. 486, 488 (2019)).

he ate meals. In January of 2016, Mullis was hospitalized for those symptoms as well as possible pancreatitis. Dr. Gill suspected possible gallbladder dyskinesia, a condition in which the gallbladder fails to digest fats and proteins properly, and ordered a radiological scan of Mullis's gallbladder. The scan showed an "extremely high" "ejection fraction" of 91%, which indicated the gallbladder either "squeezed" too slowly or too quickly. Dr. Gill concluded that Mullis had a diseased or "hyperkinetic" gallbladder. Dr. Gill spoke with Mullis about the possibility of corrective surgery and referred him to Dr. McDow, a general surgeon. Dr. Gill testified that the discussion for surgery was based on the failure of other methods to treat Mullis's symptoms and the hope that removing his "hyperkinetic" gallbladder would "solve the problem." Dr. Gill also testified that performing an exploratory liver biopsy during the gallbladder procedure was reasonable because Mullis also suffered from liver issues and the surgeon would already be in that area during the gallbladder surgery.

Dr. McDow testified that he recalled Mullis generally but did not recall most of his interactions with Mullis or his treatment of Mullis in April of 2016.[2] Dr. McDow could not recall anything about their office meeting, but did remember discussing Mullis's symptoms and care just before surgery. Dr. McDow otherwise relied on the medical records he reviewed and his operation notes. After reviewing his medical records indicating the symptoms he noted and the radiological scan, Dr. McDow concluded that Mullis suffered from gallbladder hyperkinesia. The cause of that issue was unknown, but Dr. McDow testified that when someone suffers with gallbladder ejection fractions, "the vast majority of them get better once their gallbladder's removed." Dr. McDow based this on his experience, literature, and case reports. He testified that over his career he removed an estimated 2,000 gallbladders.

---

[2] Dr. McDow's trial testimony was taken by deposition in July of 2020.

Dr. McDow used a "Da Vinci" surgical device to robotically remove Mullis's gallbladder in April of 2016. During the procedure, Dr. McDow also performed a liver biopsy, a "common" surgery for patients with liver diseases who are already undergoing surgical treatment in that area of the body. When asked if he recalled speaking with Mullis about the liver biopsy, Dr. McDow testified that "[i]t would have been discussed," but did not recall the specific discussion. He testified that comprehensive discussion of surgical treatments would take place during the office meeting, followed by a pre-surgical conversation and informed consent form. Mullis signed an informed consent form that stated he understood the potential benefits, outcomes, risks, complications, and alternatives, but the lined spaces to fill in those specific details were blank. Dr. McDow's post-surgery record stated that during the initial office visit, they discussed the "procedure, potential risks, hazards, complications, and expectations." It indicated that although Mullis previously refused a liver biopsy procedure, he "was willing to undergo this procedure during the course of his robotic" surgery.

Post-surgery, Mullis suffered from a liver bile leak, a known risk from a liver biopsy. Mullis testified that post-surgery, when he attempted to sit up, he felt intense pain all over his body. He continued to feel significant pain as they treated the bile leak, even after taking pain medication. He was bedridden for a period of time, and alleged he continued to experience pain at his March 2023 trial.

Mullis testified that in their office meeting, Dr. McDow stated that after speaking with Dr. Gill, they thought the next step to solve Mullis's abdominal issues was to remove the gallbladder. Dr. McDow described the procedure as a quick, robotic surgery. He also testified that Dr. McDow told him that he would perform a liver biopsy while performing the gallbladder surgery. Mullis asserted that neither Dr. Gill nor Dr. McDow discussed any problems shown on the radiological scan of his gallbladder or the diagnosis of hyperkinesia. He testified that had

they shared these reasons for the surgery, he would have refused the surgery as unwarranted. He also claimed that Dr. McDow did not discuss any alternatives or risks of either procedure, including the possibility of a bile leak, and that if Dr. McDow had done so, he would have refused the biopsy. Mullis testified that before the surgery, a nurse had him sign or initial a series of documents, none of which were explained, including the informed consent form; Mullis said that before the procedure Dr. McDow stopped by to ask him how he was feeling without any substantive discussion.

On cross-examination, Mullis admitted that in a prior deposition, he claimed to have no memory of seeing Dr. McDow the day of surgery. He also admitted that Dr. Gill tried a series of treatments to resolve his symptoms without success. He also agreed that Dr. Gill explained that there was a problem with his gallbladder. While at first he claimed that an assistant gave him Dr. McDow's number, when confronted with his deposition statement he then agreed that he spoke to Dr. Gill about Dr. McDow and that Dr. Gill provided Dr. McDow's contact information. When he denied that Dr. McDow discussed the risks of a liver biopsy, he was confronted with his prior deposition and then agreed it "appear[ed]" that Dr. McDow discussed the risks of a liver biopsy. When further confronted with his inconsistent testimony on this issue, he conceded that his recollection was better during his deposition. Mullis also conceded that while hospitalized for symptoms before his surgery, records indicated that Dr. McDow visited and evaluated him, but claimed he had no recollection of that meeting. Then after denying he had a chance to review the consent form, he was confronted with his deposition testimony that he was "sure [he] was" given that opportunity. Mullis also discussed a stroke he suffered in 2020 that impacted his memory as an explanation for some of his inconsistent deposition testimony.

Mullis filed a medical malpractice suit against Dr. McDow and Loudoun Medical Group, P.C., for performing the gallbladder surgery and liver biopsy without sufficient cause and/or

informed consent. Dr. McDow and Loudoun Medical Group, P.C., denied the allegations. At trial, along with the evidence outlined *supra*, both parties presented experts to testify on the issues of whether the surgical procedures were justified and if Dr. McDow met the standard of care for informed consent.

Dr. Jerge testified for Mullis as an expert general surgeon. She testified that the medical records contained no evidence that Dr. McDow satisfied the standard of care for gaining informed consent. She also opined that there was insufficient evidence that Mullis would benefit from gallbladder surgery and doing so violated the standard of care. She reviewed the requirements to diagnose a patient with hyperkinesia and determined that Mullis did not fit that criterion. Dr. Jerge later testified that hyperkinesia is an "exquisitely rare diagnosis." She opined that performing a liver biopsy also violated the standard of care because there was no indication that doing so would change his manner of treatment or care.[3]

Dr. McDow asked Dr. Jerge, during cross-examination if she agreed that Dr. Gill had concluded that a liver biopsy would be "smart and judicious" based on Dr. Gill's deposition testimony. Mullis objected on the grounds that Dr. McDow was attempting to improperly "backdoor" an expert opinion into evidence. After a lengthy sidebar discussion, Mullis withdrew his objection.[4] Dr. Jerge then agreed that Dr. Gill opined in his deposition that a liver biopsy was "smart" and "judicious," even though she disagreed with that conclusion.

---

[3] Mullis called Dr. Hofmeister, who testified that there was insufficient cause to perform a liver biopsy and doing so violated the standard of care. Dr. Tenner also testified for Mullis and opined that there was insufficient reason to perform a liver biopsy.

[4] The withdrawal appeared to involve trial strategy. Mullis confirmed that by asking if Dr. McDow was "opening the door on the rest of the deposition." After the circuit court confirmed "of course," Mullis formally withdrew his objection and noted, "I'll be permitted to -- they've opened the door on what Dr. Gill actually said."

Dr. Tenner, a gastroenterologist, also testified for Mullis and opined that there was insufficient reason to perform a liver biopsy. Dr. Tenner stated that hyperkinesia is not a diagnosis recognized by the medical community, but that he would not "ignore the fact that there are [hyperkinesia] cases in literature"; he described the condition as "very, very rare."

Dr. Russo, a liver specialist, testified for Dr. McDow. He opined that the decision to perform a liver biopsy was supported by the risk of possible cirrhosis based on Mullis's liver diseases. Dr. Johnson, a gastroenterologist, also testified that a liver biopsy was appropriate.

Dr. McDow provided a pretrial designation of medical literature under Code § 8.01-401.1 that listed 13 medical articles related to gallbladder issues and biliary hyperkinesia. Before Dr. McDow called Dr. Kercher, a general surgeon, to testify as to the diagnosis of hyperkinesia, Mullis objected on the grounds that three of those articles were too speculative to provide foundation for an expert's opinion. He argued that a hyperkinesia diagnosis was not accepted in the medical community and that Dr. Kercher should be prevented from testifying to such. Overruling Mullis's objection, the circuit court ruled that the competing diagnosis theories between the experts was a factual matter for the jury to decide and that any concerns about the medical literature were matters for cross-examination. No statements from the objected-to medical literature were read into evidence.

Dr. Kercher testified that Dr. McDow satisfied the standard of care in performing both the gallbladder surgery and the liver biopsy, as well as obtaining informed consent for those procedures. He based that opinion on Mullis's long history of symptoms, the unsuccessful treatments thus far, and the radiological scan. He testified that as a general surgeon he often used these procedures in similar circumstances. He based that opinion on the testimony regarding Mullis's and Dr. McDow's initial office meeting, the post-surgery operative note, and the informed consent form.

When Dr. McDow called Dr. Gill to testify as the final witness, Mullis argued that Dr. Gill should not be permitted to testify that a liver biopsy "was judicious or smart." The circuit court overruled the objection, finding the issue moot because Dr. Jerge had already testified that Dr. Gill believed the biopsy was "judicious or smart" after Mullis withdrew his objection during her testimony. Dr. Gill then testified to his treatment of Mullis and his opinions on the reasonableness of the surgeries that Dr. McDow performed.

At the close of Dr. McDow's evidence, Mullis moved for summary judgment on the issue of informed consent. He argued that the evidence was "unrebutted" that there was no conversation between Dr. McDow and Mullis and that such a conversation was needed to establish informed consent. Dr. McDow argued that Mullis signed a consent form, that a post-operative note from Dr. McDow evidenced a pre-surgery conversation, and that an expert witness testified that Dr. McDow complied with the standard of care as to informed consent. The circuit court found that there was sufficient evidence of a dispute for a jury to make the determination and denied the motion.

Mullis requested a modified jury finding instruction that explicitly laid out all four theories of negligence he argued to the jury: informed consent as to both procedures, and medical malpractice as to both procedures.[5] Dr. McDow requested the model jury instruction that tasked the jury to determine if Dr. McDow was negligent, whether that was a proximate cause of injury, and directed the jury to find for the defendant if Mullis failed to prove either or both elements. The circuit court opted for the model instruction.

The jury returned a verdict in favor of Dr. McDow. Mullis moved to set aside the verdict and argued that the circuit court erred: 1) by not granting summary judgment on the informed consent issue because a signature on a generalized consent form is insufficient as a matter of law;

_____

[5] Mullis did not submit a proposed instruction comporting with this request.

2) in permitting Dr. Gill to offer his "judicious and smart" expert opinion; 3) by refusing to admit Dr. Gill's deposition in Mullis's rebuttal case; 4) in admitting testimony related to biliary hyperkinesia when several of the articles were speculative and outside accepted medical practice; and 5) by denying Mullis's motion *in limine* on the informed consent expert opinion. On June 16, 2023, the circuit court entered a final order dismissing the case with prejudice based on the jury's verdict. The circuit court entered a second order on June 30, 2023, denying the motion to set aside the verdict. This appeal followed.

## ANALYSIS

### I. Informed Consent.

#### A. *Dr. Kercher's Informed Consent Opinion*

In his first assignment of error, Mullis argues that the circuit court erred in permitting Dr. Kercher to opine on the issue of informed consent without an adequate foundation. Mullis filed a pretrial motion *in limine* to prevent Dr. Kercher from testifying on the issue of informed consent; Mullis argued that Dr. Kercher lacked sufficient foundation and that the expert disclosure was not sufficient. The circuit court denied the motion *without prejudice* "for the reasons stated on the record."[6] Mullis did not subsequently object to Dr. Kercher's opinions on informed consent at trial.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "Not just any objection will do. It must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Hogle v. Commonwealth*, 75 Va. App. 743,

---

[6] The circuit court's findings are not part of the record; Dr. McDow asserted in brief that the circuit court determined that the issue of foundation could be argued at trial.

755 (2022) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). "If a party fails to timely and specifically object, he waives his argument on appeal." *Id.* "[T]he Court will not apply the exceptions" to Rule 5A:18 sua sponte. *Id.* at 756.

Mullis relies upon his pretrial motion and the circuit court's corresponding order to assert his preservation of this issue. But he failed to provide a transcript or statement of facts reflecting the circuit court's findings at the hearing and the reasons for dismissing his pretrial motions "without prejudice." "[O]n appeal the judgment of the lower court is presumed to be correct and the burden is on the appellant to present to us a sufficient record from which we can determine whether the lower court has erred in the respect complained of." *Smith v. Commonwealth*, 16 Va. App. 630, 635 (1993) (quoting *Justis v. Young*, 202 Va. 631, 632 (1961)). "If the appellant fails to do this, the judgment will be affirmed." *Id.* (quoting *Justis*, 202 Va. at 632); *see also* Rule 5A:8(b)(4)(ii) (If the appellant fails to "ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission shall not be considered."). Thus, with no record to determine what the circuit court dismissed without prejudice and why the circuit court made that decision, we have an insufficient record for appellate review of this issue.

Mullis argues that under Code § 8.01-384, he was not required to object after making his motion *in limine* to preserve his argument. While it is true that a party need not continually object, a party must obtain a ruling on an issue to preserve appellate review. *Fisher v. Commonwealth*, 16 Va. App. 447, 454 (1993); *see also Taylor v. Commonwealth*, 208 Va. 316, 324 (1967) (assignment of error waived on appeal where the trial court did not rule on defendant's objection, and defendant "did not insist that the court rule" on his objection); *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010) (appellant waived his assignment of error on appeal because he did not obtain a ruling from the trial court on his pretrial motion to

- 9 -

dismiss).  Assuming without deciding that the motion *in limine* was sufficient to place the court on notice that he objected to Dr. Kercher's testimony, the sparse record before us is insufficient to determine if the circuit court made such a ruling on the merits of his motion, or instead denied it only as premature with the expectation that Mullis would raise it at trial when the evidence was presented.  With no record of the pretrial hearing, an order that only dismisses "without prejudice" for reasons stated on that missing record, and no objection at trial to the admission of the evidence, there is no circuit court decision on the foundation of Dr. Kercher's opinion for this Court to properly review.

### B.  *Summary Judgment on Informed Consent*

In his second assignment of error, Mullis asserts that the circuit court erred in denying his motion for summary judgment on the issue of informed consent.  We disagree.

"[W]e review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009).  A motion for summary judgment should only be granted "when there are no material facts genuinely in dispute," and not when "the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence." *Id.*  The determination on whether "genuinely disputed material facts exist and its application of law to the facts present issues of law subject to de novo review." *Shifflett v. Latitude Props., Inc.*, 294 Va. 476, 480 (2017) (quoting *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 196-97 (2017)).

"To succeed on an informed consent claim, the plaintiff must establish that the physician breached the standard of care by failing to disclose the material risks associated with the treatment or procedure, or the existence of alternatives if there are any[.]" *Pergolizzi v. Bowman*,

- 10 -

76 Va. App. 310, 323 (2022) (quoting *Allison v. Brown*, 293 Va. 617, 628-29 (2017)). "Virginia courts measure that standard of care by the 'degree of skill and diligence exercised by a reasonably prudent practitioner in the same field of practice or specialty in Virginia.'" *Id.* at 324 (quoting *Tashman v. Gibbs*, 263 Va. 65, 73 (2002)). A plaintiff proves this claim by first establishing the standard of care through expert testimony, then establishing through lay testimony that the physician failed to disclose necessary information and that the patient would not have agreed to the procedure if that information had been revealed. *Id.* Thus, if any of these facts are "genuinely disputed," summary judgment should not be granted. *Shifflett*, 294 Va. at 480 (quoting *Mount Aldie, LLC*, 293 Va. at 196-97).

The evidence of informed consent was disputed in this case. Although, years later, Dr. McDow could not recall the specific meeting with Mullis, he testified that as a matter of practice he provides his patients with a comprehensive discussion of the procedures. His post-operative note documented that during that meeting they discussed the "procedure, potential risks, hazards, complications, and expectations." Mullis claimed that no such conversation took place, but he was impeached with his inconsistent deposition testimony and admitted to having memory issues. Mullis then signed an informed consent form that stated he understood the potential benefits, outcomes, risks, complications, and alternatives. He denied at trial having the opportunity to read and understand that document before signing it, but this testimony flatly contradicted his deposition testimony that he was "sure [he] was" given that opportunity. Both parties presented experts that discussed the standard of care for informed consent and whether the medical records and deposition testimonies supported such a finding. This issue was in genuine dispute and was therefore ripe for the jury to consider. Thus, the circuit court did not err in denying the motion for summary judgment.

## II. Dr. Kercher's Hyperkinesia Opinion

Mullis next argues that the circuit court erred in allowing Dr. Kercher to opine on hyperkinesia because the supporting scientific documentation was "unreliable."

We review a trial court's "ruling on the admissibility of testimony, whether expert or lay, . . . for an abuse of the court's discretion." *Emerald Point, LLC v. Hawkins*, 294 Va. 544, 553 (2017). An expert witness "may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify." Code § 8.01-401.1; *accord* Va. R. Evid. 2:703(a). "Expert testimony generally is admissible in civil cases if it will aid the trier of fact in understanding the evidence." *Keesee v. Donigan*, 259 Va. 157, 161 (2000). "When scientific evidence is offered, the court must make a threshold finding of fact with respect to the reliability of the scientific method offered[.]" *Spencer v. Commonwealth*, 240 Va. 78, 97 (1990). "Wide discretion must be vested in the trial court to determine . . . whether the evidence is so inherently unreliable that a lay jury must be shielded from it, or whether it is of such character that the jury may safely be left to determine credibility for itself." *Id.* at 98. "In making the threshold finding of fact, the court must usually rely on expert testimony. If there is a conflict, and the trial court's finding is supported by credible evidence, it will not be disturbed on appeal." *Id.* at 97.

We find no error in the circuit court's denial of Mullis's objection. At the time he made his objection, his own witness, Dr. Jerge, had already testified that hyperkinesia is an "exquisitely rare diagnosis." When she reviewed the appropriateness of that claim, she did not opine that hyperkinesia was a "junk" science. Instead, she reviewed the criteria of hyperkinesia and compared that criterion to Mullis's symptoms and condition, ultimately opining that Mullis simply did not have that condition. Dr. Tenner, another of Mullis's own experts, described hyperkinesia as "unrecognized," but then opined that he would not "ignore the fact that there are

- 12 -

[hyperkinesia] cases in literature" and described it as "very, very rare." Thus, Mullis's own experts, after reviewing the medical science for hyperkinesia, appeared to recognize it as an extremely rare, but real, condition.

Mullis argued at trial and in brief that three pieces of medical literature were too speculative and should be excluded at trial. But no portions of those articles were read into evidence. Dr. Kercher relied on his own training and experience in testifying about hyperkinesia as an expert surgeon, and Dr. Gill testified similarly as an expert gastroenterologist. The circuit court does not properly exclude scientific evidence for being "unrecognized," but rather for being "inherently unreliable." *Spencer*, 240 Va. at 98. Mullis presented no expert testimony to support that finding, and his own experts appeared to trust the medical literature on hyperkinesia to conclude that it is a very rare condition.

### III. Dr. Gill's Liver Biopsy Opinion

Mullis next asserts that the circuit court erred in permitting Dr. Gill to testify that a liver biopsy was "judicious" or "smart" because it was not properly designated in Dr. Gill's expert designation.

"[H]armless-error review [is] required in *all* cases." *Moore v. Joe*, 76 Va. App. 509, 516 (2023) (second alteration in original) (quoting *Spruill v. Garcia*, 298 Va. 120, 127 (2019)). "When it plainly appears from the record and the evidence . . . that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed." *Id.* at 516-17 (alteration in original) (quoting Code § 8.01-678). "Thus, '[a]ny error that does not implicate the trial court's subject matter jurisdiction is subject to harmless-error analysis.'" *Id.* at 517 (alteration in original) (quoting *Spruill*, 298 Va. at 127).

We need not reach the merits of whether Dr. Gill's opinion on the liver biopsy was properly designated, because any such error would be harmless as a matter of law. At the time

- 13 -

that Dr. Gill testified to this opinion, Mullis's expert, Dr. Jerge, had already testified that Dr. Gill concluded that a liver biopsy was "judicious" or "smart."  Mullis had originally objected to this evidence coming in through Dr. Jerge, but then chose to withdraw that objection, seemingly for trial strategy purposes.  Thus, evidence of Dr. Gill's opinion on the liver biopsy was already admitted without objection and was before the jury.  Permitting Dr. Gill to repeat that opinion was not so prejudicial so as to deny Mullis "a fair trial on the merits."  *Id.* at 516-17 (quoting Code § 8.01-678).

## IV.  Jury Finding Instruction

In his last assignment of error, Mullis contends that the circuit court erred in refusing his modified jury instruction in lieu of the model instruction on finding negligence.

"A trial court's decision whether to grant or refuse a proposed jury instruction is generally subject to appellate review for abuse of discretion."  *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017).  "When we review a trial court's decision to refuse jury instructions, the evidence is viewed in the light most favorable to the proponent of the instruction." *Hancock-Underwood v. Knight*, 277 Va. 127, 130 (2009).  "A litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law."  *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004).  "Where other instructions fully and fairly cover the principles of law governing the case, the trial court does not err in refusing an additional instruction on the same subject."  *Howsare*, 293 Va. at 443.

The given instruction required the jury to find for Mullis if he established under his burden of proof that Dr. McDow was negligent and that Dr. McDow's negligence was a proximate cause of injuries to Mullis.  The instruction required the jury to find for Dr. McDow if "Mullis failed to prove either or both of the two elements above."  Mullis does not contend that

the model instruction did not "generally accurately state the law." He instead asserts that he was entitled to a modified instruction that laid out all four theories of negligence rather than a finding instruction that simply asked the jury to decide if Dr. McDow was negligent. He suggests that the jury was improperly led to believe that Mullis only alleged one negligent act against Dr. McDow.

Mullis's first point in closing argument was to outline "the four different kinds of negligence" he alleged against Dr. McDow, and then review the evidence to argue that he met his burden of proof as to all four theories of negligence. In response, Dr. McDow addressed all four theories of negligence in requesting a defense verdict. The jury instructions also included not only general definitions of negligence, but also the duties specific to informed consent, and the duties that medical providers had in treating their patients. The record does not support a finding that the jury was in any way misled by the finding jury instruction given, or that providing a modified instruction was necessary for the jury to properly consider the case and the evidence. The jury instructions, including the model finding instruction given to the jury, accurately stated the law, framed the issues, and conformed to the evidence presented and Mullis's theories of recovery. We therefore conclude that the circuit court did not abuse its discretion in giving the model finding instruction.[7]

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*

---

[7] Moreover, since Mullis did not submit a proposed instruction, we have no way of determining whether it would have correctly stated the law.